No. 03-256

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 179

_____

JOAN K. McCORMICK, f/k/a JOAN K. BREVIG,

        Plaintiff and Appellant,

   v.

CLARK A. BREVIG, BREVIG LAND LIVE
AND LUMBER, a Montana General Partnership
Consisting of Joan K. Brevig and Clark A. Brevig,

        Defendants, Respondents and Cross-Appellants.

_____

APPEAL FROM:    District Court of the Tenth Judicial District,
                In and For the County of Fergus, Cause No. DV 95-86,
                Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Kenneth R. Dyrud, Glenn E. Tremper, and Cindy L. Cate, Church,
                Harris, Johnson & Williams, P.C., Great Falls, Montana

        For Respondents:

                David A. Veeder, Jolane D. Veeder, Veeder Law Firm, P.C.,
                Billings, Montana

_____

                Submitted on Briefs:  December 11, 2003

                        Decided:  July 13, 2004

Filed:

                _____
                         Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     This case involves a protracted dispute between a brother and sister concerning their respective interests in a ranching partnership that is before the Court a second time. The litigation began in 1995 when Joan McCormick ("Joan") brought this action against her brother, Clark Brevig ("Clark"), and their Partnership, Brevig Land Live and Lumber (hereinafter, "the Partnership"), seeking a Partnership accounting and dissolution. Clark counterclaimed for fraud, deceit, negligent misrepresentation, and to quiet title. He also filed a third-party complaint against several accounting defendants for professional negligence and against his sister for breach of fiduciary duty. Thereafter, Joan moved for partial summary judgment in relation to Clark's counterclaim and third-party complaint, and Clark moved for partial summary judgment on the issue of liability raised in his counterclaim and third-party complaint against Joan. Clark also moved for partial summary judgment on the issue of liability against the third-party accounting defendants. The District Court of the Tenth Judicial District, Fergus County, granted Joan's motion for partial summary judgment on her claims and denied Clark's motion for partial summary judgment against Joan. The court additionally dismissed Clark's claims for fraud, deceit, negligent misrepresentation, and breach of fiduciary duty against Joan.

¶2     The accounting defendants also moved for summary judgment on all claims asserted against them by Clark, which the court granted. Following certification of the summary judgment orders as final pursuant to Rule 54(b), M.R.Civ.P., the parties appealed to this Court. We affirmed the District Court's entry of summary judgment in favor of Joan, but

2

concluded that the court had erred in granting summary judgment to the accounting defendants, and therefore reversed and remanded for further proceedings. *McCormick v. Brevig*, 1999 MT 86, 294 Mont. 144, 980 P.2d 603 (hereinafter referred to as, "*McCormick I*").

¶3 Following remittitur and substitution of the original trial judge, the District Court resumed proceedings concerning the Partnership accounting and dissolution, and Clark settled his claims with the accounting defendants. A bench trial was held January 18 through 21, 2000. On April 3, 2000, the District Court entered findings of fact and conclusions of law, dissolving the Partnership, and ordering its business wound up, pending a hearing before a special master and a determination of the proper method for dissolution.

¶4 A limited accounting by a special master was thereafter performed. On December 27, 2001, the District Court concluded that the parties' Partnership agreement did not apply, and that a judicial dissolution of the Partnership was warranted pursuant to § 35-10-624(5), MCA. The court further recognized that § 35-10-629, MCA, explicitly required any surplus assets after paying creditors to be paid to the partners in cash in accordance with their right to distribution. Nonetheless, the court found that it would be inequitable to order the liquidation of the Partnership assets in order to satisfy Joan's interest in the Partnership. Therefore, in keeping with its desire to preserve the family farm, the court ordered Joan to sell her interest in the Partnership to her brother following an appraisal and determination of the value of her share. With the assistance of a special master, and following an accounting of Partnership assets, the District Court eventually fixed a price of $1,107,672

3

on Joan's 50 percent interest in the Partnership. Joan appeals from the District Court's accounting and order requiring her to sell her interest in the Partnership to her brother, and Clark cross-appeals from the court's determination regarding certain Partnership assets, as well as from an evidentiary ruling made at trial. We affirm in part, reverse in part, and remand for further proceedings.

¶5 The following issues are presented on appeal:

¶6 1. After ordering dissolution of the Partnership, did the District Court err by failing to order liquidation of the Partnership assets, and instead granting Clark the right to purchase Joan's Partnership interest at a price determined by the court?

¶7 2. Did the District Court err by failing to grant Joan's petition for an accounting of the Partnership's business affairs?

¶8 3. Did the District Court err by adopting the findings of the special master?

¶9 4. Did the District Court err in ruling that Clark did not dissociate by withdrawing from the Partnership?

¶10 5. Did the District Court err in concluding that the Charolais cattle constituted partnership assets?

¶11 6. Did the District Court err by excluding evidence of a teleconference and concluding that Clark was not entitled to compensation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶12 Joan and Clark are the children of Charles and Helen Brevig (hereinafter, "Charles" and "Helen"). In 1960 Charles purchased the Brevig Ranch outside of Lewistown from his

4

parents. In 1971, Charles transferred his sole interest in the ranch by warranty deed to himself and Helen as joint tenants. The following year, Charles and Helen conveyed the ranch to Clark and Helen as joint tenants.

¶13 When Charles and Helen divorced in 1977, Helen conveyed her interest in the ranch to Charles in the property settlement agreement. Thereafter, Clark and his father owned the ranch in equal shares, and began operating the ranch as Brevig Land, Live & Lumber, a partnership, pursuant to a written agreement.

¶14 Although she was not a partner in the ranch operation, Joan lived on the ranch and assisted in ranch operations from 1975 until 1981. In 1981, with the ranch facing severe financial hardship, Joan left the ranch to work as an oil and gas "landman," in order to generate outside income to enable the ranch to meet its financial obligations. In her capacity as a landman, Joan served as a liaison between the oil industry and the mineral owners. This work required her to travel throughout the United States performing title searches on a *per diem* basis.

¶15 In 1982, Charles and Clark sought to refinance the farm debt in the amount of $422,000 with the Federal Land Bank. Because the ranch operation did not generate sufficient cash flow to meet the projected debt payment, the bank required Joan to sign the mortgage which was secured by the ranch real estate. Joan's income as a landman became committed to assist in repayment of the ranch debt.

¶16 During the time of Joan's employment as a landman from 1981 through 1986, it was Joan's practice to contribute all of her income, less expenses, to the support of the ranch

5

operation. In 1983, Joan closed her personal bank account and began to deposit all of her income into the partnership bank account. From this account, Joan would pay her personal expenses and the balance would be applied to the obligations of Charles and Clark's partnership. After she married in 1986, Joan made payments directly to the banks for the ranch obligations rather than to deposit the money in the ranch operating account. Joan also made direct payments for taxes and insurance.

¶17    On October 28, 1982, Charles died unexpectedly after a short illness. Thereafter, pursuant to Charles' Last Will and Testament, Clark and Joan were appointed co-personal representatives and probated Charles' estate. Clark and Joan each received one-half of Charles' estate, which principally consisted of his 50 percent interest in the ranch and Partnership. As a result of the distributions, Clark then owned 75 percent of the ranch assets, and Joan 25 percent. A written partnership agreement was thereafter executed by Clark and Joan reflecting their respective 75/25 percent interests in the Partnership. Except for these ownership percentages, the written agreement was identical to the one executed between Charles and Clark in 1978.

¶18    After Charles' death, Joan continued her work as a landman, and made financial contributions to the new Partnership. She also maintained the Partnership's books and records. Meanwhile, Clark assumed responsibility for the day-to-day affairs of the ranch. Clark and Joan made management decisions together.

¶19    In 1984, Joan obtained an additional 25 percent in the Partnership, fully paying for this interest by the following year. For his share of the sale, Clark received a capital credit

of approximately $60,000. From 1984 to 1993, Joan was listed as a 50/50 partner on all the tax returns for the Partnership.

¶20 Around November 1986, at the recommendation of the Partnership's principle accountant, Clark and Joan executed an addendum to the Partnership agreement, reflecting their agreement to make adjustments in the Partnership interests based on varying capital contributions. The addendum was needed to account for the excess capital contributions made by Joan, and to conform that part of the agreement to the tax returns which showed Clark and Joan as equal partners. The parties had agreed, however, that Joan's interest in the Partnership would not exceed 50 percent, regardless of the amount of her excess capital contributions.

¶21 Disagreements concerning management of the ranch, and particularly, management of the debt load on the ranch, caused Clark and Joan's relationship to deteriorate. By the early 1990s, cooperation between Clark and Joan regarding the operation of the ranch and securing of loans necessary to fund the ranch had essentially ceased, and they began looking for ways to dissolve the Partnership.

¶22 In 1995, Joan brought suit against Clark and the Partnership, alleging that Clark had converted Partnership assets to his own personal use, and sought an accounting of the Partnership's affairs. She also requested a determination that Clark had engaged in conduct warranting a decree of expulsion. Alternatively, Joan sought an order dissolving and winding up the Partnership.

¶23 Clark answered by denying that the ranch property was held by the Partnership, and asserted counterclaims for fraud, deceit, negligent misrepresentation and to quiet title. Clark maintained that he owned the ranch, either by virtue of a trust allegedly created by his father, or through two incomplete deeds to the property that Clark had completed and recorded without Joan's knowledge. Clark also brought third-party claims against the Partnership's accountants.

¶24 On appeal, this Court affirmed the District Court's determination that neither the alleged trust nor the incomplete deeds transferred the ranch property to Clark. We remanded the case for resolution of Joan's claims for an accounting and other relief, and for a determination as to Clark's claims against the accountants. *McCormick I*, ¶ 119.

¶25 Clark thereafter settled his claims against the Partnership accountants, and the matter proceeded to a bench trial as to Joan's claims for dissolution and an accounting. On April 3, 2000, the District Court issued findings of fact and conclusions of law, finding that neither Clark nor Joan had dissociated from the Partnership, that Joan was a 50 percent partner and should be credited for any excess capital contributions she made to the Partnership, and that Clark was not entitled to receive compensation as a partner. The court further concluded that the Partnership should be dissolved and its business wound up, and reasoned that appointment of a special master was appropriate in order to determine the amount of the parties' respective capital contributions and Partnership assets.

¶26 On February 7, 2001, following the appointment and discharge of the two previous masters, Larry Blakely, CPA, ("Blakely") was appointed special master. Blakely was vested

8

with the authority to inquire into all pertinent matters of record and charged with determining the amount, if any, of Joan's excess capital contributions to the Partnership as well as to resolve disputes concerning Partnership assets.

¶27 After meeting with the parties on an informal basis and reviewing Partnership tax returns for the period of 1985 through 1998, Blakely filed his initial report with the court. In his report, Blakely concluded that there were no excess capital contributions made by Joan to the Partnership, and that Clark had not utilized any Partnership assets for his own benefit.

¶28 Joan objected to Blakely's report, arguing that he had improperly limited himself to draft and unfiled tax returns previously prepared by Russ Spika, CPA ("Spika"), and had failed to consider evidence which Joan had presented showing significant contributions to the Partnership. Joan further argued that Blakely had failed to follow the historical methods of accounting that had been used by the Partnership up through 1993, which Clark was estopped from challenging pursuant to the court's April 3, 2000 order.

¶29 A hearing on the parties' objections to the special master's findings was held on November 26, 2001. On December 27, 2001, the District Court ordered the value of Joan's interest in the Partnership to be determined following an appraisal conducted and paid for by the Partnership. Following such determination, Clark would have sixty days in which to purchase Joan's interest, or the Partnership assets would be liquidated and the net assets distributed to the partners.

¶30 A real estate appraiser was subsequently appointed by the court, and a new series of disputes concerning the appraisal process began. On August 7, 2002, the court entered an

9

order appointing additional real estate appraisers to assist in the appraisal process, and reenlisted the services of special master Blakely to review the revised Partnership income tax returns prepared by Spika for the 1994 through 2001 tax years. In making his report, the court directed Blakely to meet separately with the respective parties, their counsel and accountants, and to determine whether the partnership income tax returns prepared by Spika should be filed with the Internal Revenue Service. The court further ordered Blakely to determine the net value of Joan's share of the appraised Partnership assets.

¶31    On December 12, 2002, Blakely filed his final report with the court, accepting Spika's tax returns, and valuing Joan's interest in the Partnership at $795,629. Joan objected to Blakely's findings and a hearing followed. On January 29, 2003, the District Court entered findings of fact and conclusions of law, accepting Blakely's findings and valuing Joan's interest in the Partnership at $1,107,672. Clark thereafter tendered this amount to Joan for the purchase of her interest, which Joan rejected. This appeal followed.

## STANDARD OF REVIEW

¶32    We review a district court's findings of fact to determine whether the findings are clearly erroneous. *Baltrusch v. Baltrusch*, 2003 MT 357, ¶ 23, 319 Mont. 23, ¶ 23, 83 P.3d 256, ¶ 23. A district court's findings are clearly erroneous if substantial credible evidence does not support them, if the trial court has misapprehended the effect of the evidence or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19. We review a district court's conclusions of law for correctness. *Baltrusch*, ¶ 23.

10

## DISCUSSION

**¶33    After ordering dissolution of the Partnership, did the District Court err by failing to order liquidation of the Partnership assets, and instead granting Clark the right to purchase Joan's Partnership interest at a price determined by the court?**

¶34    Joan contends that when a partnership is dissolved by judicial decree, Montana's Revised Uniform Partnership Act, § 35-10-101 et. seq., MCA (2001), requires liquidation by sale of partnership assets and distribution in cash of any surplus to the partners. In response, Clark asserts that there are other judicially acceptable methods of distributing partnership assets upon dissolution besides liquidating assets through a forced sale.  For the reasons set forth below, we conclude that the Revised Uniform Partnership Act requires liquidation of partnership assets and distribution of the net surplus in cash to the partners upon dissolution entered by judicial decree when it is no longer reasonably practicable to carry on the business of the partnership.

¶35    We begin our analysis by reviewing the law of partnerships as it pertains to the issues in this case.  A partnership is an association of two or more persons to carry on as co-owners a business for profit.  *See* § 35-10-102(5)(a), MCA; *see also* § 35-10-201(1), MCA (1991). An informal or oral agreement will usually suffice to create a partnership, and where a partnership agreement exists, it will generally govern relations among partners.  Thus, statutory rules are merely default rules, which apply only in the absence of a partnership agreement to the contrary.  *See* § 35-10-106, MCA.  In the present case, the parties do not dispute that the partnership agreement did not apply to situations involving a court ordered dissolution of a partnership.

11

¶36 Partnership law in Montana and throughout the United States has been primarily derived from the Uniform Partnership Act ("UPA"), which was originally promulgated by the Uniform Law Commissioners in 1914. Under the UPA, the law of partnership breakups was couched in terms of dissolution. A partnership was dissolved and its assets liquidated upon the happening of specific events, the most significant of which was the death of a partner or any partner expressing a will to leave the partnership. Montana adopted the UPA in 1947.

¶37 In 1993, our legislature significantly amended the UPA by adopting the Revised Uniform Partnership Act, or RUPA.[1] Unlike the UPA, RUPA now provides two separate tracks for the exiting partner. The first track applies to the dissociating partner, and does not result in a dissolution, but in a buy-out of the dissociating partner's interest in the partnership. *See* § 35-10-616, MCA. The term "dissociation" is new to the act, and occurs upon the happening of any one of ten events specified in § 35-10-616, MCA. Examples of events leading to dissociation include bankruptcy of a partner and death, *see* § 35-10-616(6)(a) and (7)(a), MCA, but does not include a judicially ordered dissolution of the partnership.

¶38 The second track for the exiting partner does involve dissolution and winding up of the partnership's affairs. Section 35-10-624, MCA, sets forth the events causing dissolution and winding up of a partnership, and includes the following:

[1]Although the 1993 Legislature did not amend the title of the UPA, it adopted the changes embodied within the Revised Uniform Partnership Act ("RUPA") and, therefore, we shall refer to the act throughout this opinion as "RUPA."

12

**Events causing dissolution and winding up of partnership business.**

. . .

(5) a judicial decree, issued upon application by a partner, that:

(a) the economic purpose of the partnership is likely to be unreasonably frustrated;

(b) another partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business in partnership with that partner; or

(c) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement[.]

¶39 In this case, the District Court dissolved the Partnership pursuant to § 35-10-624(5), MCA. In so doing, it recognized that, in the absence of a partnership agreement to the contrary, the only possible result under RUPA was for the partnership assets to be liquidated and the proceeds distributed between the partners proportionately. The court reasoned, however, that the term "liquidate" had a variety of possible meanings, one of which was "to assemble and mobilize the assets, settle with the creditors and debtors and apportion the remaining assets, if any, among the stockholders or owners." Applying this definition, which the court had obtained from *Black's Law Dictionary*, the court concluded that a judicially ordered buy-out of Joan's interest in the Partnership by Clark was an acceptable alternative to liquidation of the partnership assets through a compelled sale.

¶40 It is well established that "the role of courts in applying a statute has always been to 'ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.'" *State v. Goebel*, 2001 MT 73, ¶ 16, 305 Mont. 53, ¶ 16, 31 P.3d 335, ¶ 16 (citation omitted). "[T]he intent of the Legislature is controlling when construing a statute. The intention of the Legislature must first be

13

determined from the plain meaning of the words used, and if interpretation of the statute can be so determined, the courts may not go further and apply any other means of interpretation." *Goebel*, ¶ 17.

¶41 It is true that this Court has previously utilized dictionaries when seeking to define the common use and meaning of terms. *See Ravalli County v. Erickson*, 2004 MT 35, ¶ 13, 320 Mont. 31, ¶ 13, 85 P.3d 772, ¶ 13. However, in this case, we conclude that it was not necessary for the District Court to resort to such devices. Section 35-10-629(1), MCA, clearly provides that "[i]n winding up a partnership's business, the assets of the partnership must be applied to discharge its obligations to creditors, including partners who are creditors. Any surplus must be applied to pay *in cash* the net amount distributable to partners in accordance with their right to distributions pursuant to subsection (2)." (Emphasis added.) Furthermore, subsection (2) of the statute provides:

> Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the *liquidation of the partnership assets* must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to that partner's positive account balance.

(Emphasis added.) Thus, the common purpose and plain meaning of the term "liquidation," as it is used in § 35-10-629(2), MCA, is to reduce the partnership assets to cash, pay creditors, and distribute to partners the value of their respective interest. *See also* 59A Am. Jur. 2d *Partnership* § 1100 (2003). This is all part of the process of "winding up" the business of a partnership and terminating its affairs.

14

¶42 Clark invites this Court to take a liberal reading of § 35-10-629, MCA, and cites *Creel v. Lilly* (Md. 1999), 729 A.2d 385, in support of the proposition that judicially acceptable alternatives exist to compelled liquidation in a dissolution situation. At issue in *Creel* was whether the surviving partners of a partnership had a duty to liquidate all partnership assets because there was no provision in the partnership agreement providing for the continuation of the partnership upon a partner's death, and the estate had not consented to the continuation of business. *Creel*, 729 A.2d at 387. After examining cases in which other courts had elected to order an in-kind distribution rather than a compelled liquidation, or had allowed the remaining partners to purchase the withdrawing partner's interest in the partnership, the court concluded that the UPA did not mandate a forced sale of all partnership assets in order to ascertain the true value of the business, and that "winding up" was not always synonymous with liquidation. *Creel*, 729 A.2d at 403. The court further noted that it would have reached the same conclusion regardless of whether the UPA or RUPA governed since, under RUPA, the remaining partners could have elected to continue business following the death of one of the partners. *Creel,* 729 A.2d at 397.

¶43 However, of critical distinction between the facts in *Creel* and the case *subjudice* is the manner in which the partners exited the entity. In *Creel* one of the partners had died. Here, Joan sought a court ordered dissolution of the Partnership. Under RUPA, the death of a partner triggers the provisions of § 35-10-619, MCA, which allows for the purchase of the dissociated partner's interest in the partnership, much like what was ordered in *Creel*. Conversely, a court ordered dissolution pursuant to § 35-10-624(5), MCA, as in this case,

15

results in the dissolution and winding up of the partnership. Thus, *Creel* is both legally and factually distinguishable.

¶44	Furthermore, the cases relied upon by the court in *Creel* in reaching its conclusion that liquidation of assets was not always mandated upon dissolution, *Nicholes v. Hunt* (Or. 1975), 541 P.2d 820, *Logoluso v. Logoluso* (Cal. 1965), 43 Cal.Rptr. 678, *Gregg v. Bernards* (Or. 1968), 443 P.2d 166, *Goergen v. Nebrich* (N.Y. 1958), 174 N.Y.S.2d 366, and *Fortugno v. Hudson Manure Co.* (N.J. 1958), 144 A.2d 207, are likewise pre-RUPA holdings, which are inapposite to the facts at issue in this case.

¶45	Accordingly, we conclude that when a partnership's dissolution is court ordered pursuant to § 35-10-624(5), MCA, the partnership assets necessarily must be reduced to cash in order to satisfy the obligations of the partnership and distribute any net surplus in cash to the remaining partners in accordance with their respective interests.  By adopting a judicially created alternative to this statutorily mandated requirement, the District Court erred.

¶46	**Did the District Court err by failing to grant Joan's petition for an accounting of the Partnership's business affairs?**

¶47	 Joan maintains that the accounting performed by special master Blakely was inadequate as it was limited to a review of tax returns, some of which were unfiled drafts, for the years 1985 to 2001.  She argues that the partnership tax returns failed to account for the nearly $400,000 Clark allegedly removed from the Partnership for his own personal use. Clark responds that the District Court found no competent evidence supporting Joan's claim

16

that he wrongfully took funds from the Partnership, and argues that Joan agreed to the special master's limited accounting. However, the record reveals no such stipulation by Joan.

¶48 Every partner is generally entitled to have an accounting of the partnership's affairs, even in the absence of an express contract so providing. 59A Am. Jur. 2d *Partnership* § 617. Moreover, RUPA provides that a partner may maintain an action against the partnership or another partner for legal or equitable relief, including an accounting as to partnership business, or to enforce a right to compel a dissolution and winding up of the partnership business under § 35-10-624, MCA. *See* § 35-10-409(2)(b)(iii), MCA.

¶49 The purpose of an accounting is to determine the rights and liabilities of the partners, and to ascertain the value of the partners' interests in the partnership as of a particular date, such as the date of dissolution. 59A Am. Jur. 2d *Partnership* at § 667. "When an action for an accounting is being used to wind up the partnership's affairs, the court is obligated to provide 'for a full accounting of the partnership assets and obligations and distribution of any remaining assets or liabilities to the partners in accordance with their interests in the partnership.'" *Guntle v. Barnett* (Wash. 1994), 871 P.2d 627, 630. This is often accomplished through the appointment of a special master subject to court review, who conducts a comprehensive investigation of the transactions of the partnership and the partners. *Guntle* , 871 P.2d at 630. In rendering the accounting, mere summaries or lump listings of types of items, or schedules of cash to be distributed without detailing the firm's transactions, are generally insufficient, as are mere tax returns. 59A Am. Jur. 2d *Partnership* at § 621; *Juliano v. Rea* (1982), 452 N.Y.S.2d 668, 669.

¶50    In this case, special master Blakely was charged with determining the amount of Joan's excess capital contributions and resolving disputes concerning ownership of Partnership assets.  In this regard, Blakely performed a detailed accounting of the assets, liabilities, and capital contributions of each of the partners.  While he accomplished much of this by reviewing the partnership tax returns from 1985 to 2001, some of which were apparently in draft form, Blakely also held several extensive meetings with the parties in which he heard oral arguments and received evidence.  From these meetings, and information obtained from the partnership tax returns, Blakely prepared and submitted two reports to the District Court, detailing the partners' respective capital contributions and withdrawals, as well as partnership assets and liabilities.  These reports further itemized transactions occurring within the Partnership from 1995 through 2001, and included a break-down for Blakely's determination of the suggested purchase price for Joan's interest in the Partnership. This was sufficient given the issues which were presented for Blakely's review, and given the fact that he testified before the District Court and was subject to cross-examination concerning his findings.

¶51    Because we conclude, however, that the Partnership's assets must be liquidated in order to satisfy the Partnership's obligations to its creditors and distribute the net surplus of any assets in cash to the partners, on remand it will become necessary for the District Court to perform a full accounting of the Partnership's affairs.  Once again, this requires a detailed accounting of all the Partnership's assets and liabilities, as well as distributions of assets and

18

liabilities to the partners in accordance with their respective interests in the Partnership. Blakely's reports may very well be of assistance in this process.

¶52 **Did the District Court err by adopting the findings of the special master?**

¶53 Joan challenges the District Court's adoption of the special master's findings by arguing that the procedures before the special master failed to comply with Rule 53, M.R.Civ.P., and takes particular issue with the master's failure to hold proceedings on the record, as well as what she perceives as his failure to prepare findings of fact and conclusions of law.

¶54 Rule 53, M.R.Civ.P., allows a district court to appoint a master in complicated cases to examine a matter and make a report thereon. *Maloney v. Home and Investment Center, Inc.*, 2000 MT 34, ¶ 28, 298 Mont. 213, ¶ 28, 994 P.2d 1124, ¶ 28. Rule 53(c), M.R.Civ.P., pertains to the power of masters and provides in relevant part:

> The order of reference to the master may specify or limit the master's powers, and may direct the master to report only upon particular issues . . . . Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order. . . . *When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Montana Rules of Evidence for a court sitting without a jury.*

(Emphasis added.) Furthermore, pursuant to Rule 53(e)(1), M.R.Civ.P., "the master shall prepare a report upon the matters submitted to the master by the order of reference and, *if required to make findings of fact and conclusions of law*, the master shall set them forth in

the report." (Emphasis added.) In non-jury actions, the District Court is required to accept the master's findings of fact unless clearly erroneous. Rule 53(e)(2), M.R.Civ.P.

¶55 In the present case, the order referring the matter to special master Blakely charged Blakely with rendering a decision on (1) the amount, if any, of Joan's excess capital contributions to the Partnership, and (2) what personal property was or was not obtained and maintained by Partnership assets, and what should be considered individual property. The order further directed Blakely to "conduct necessary hearings with all necessary parties and their attorneys as may be practicable," and to "review the necessary law and thereafter render a report including Findings of Fact and Conclusions of Law concerning the merits of this matter . . . ."

¶56 Blakely complied with the court's directive by holding hearings with the parties, their attorneys and accountants, receiving evidence, and issuing a report to the court. Blakely's determinations were not in a typical findings of fact and conclusions of law format, but, nonetheless, recognizing that Blakely is an accountant, not a lawyer, we conclude that Blakely's reports to the District Court satisfied the requirements of Rule 53(e), M.R.Civ.P. Furthermore, in the absence of a request by the parties, special master Blakely was not obligated to make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Montana Rules of Evidence for a court sitting without a jury. *See* Rule 53(c), M.R.Civ.P. Because the burden of challenging a master's findings is on the party objecting, *Maloney*, ¶ 28, and Joan has not established that

20

the master's findings are clearly erroneous, we conclude the District Court did not err in accepting the special master's report.

**¶57 Did the District Court err in ruling that Clark did not dissociate by withdrawing from the Partnership?**

¶58 In her amended complaint, Joan petitioned the District Court for an order expelling Clark from the Partnership pursuant to § 35-10-616, MCA, as a result of his allegedly wrongful conduct of converting Partnership assets to his own personal use. Following a non-jury trial, the District Court concluded that neither party had dissociated from the Partnership, and denied Joan's request for an order of expulsion.

¶59 On appeal, Joan contends that the District Court failed to consider evidence showing that Clark had dissociated from the Partnership pursuant to § 35-10-616(5), MCA. She argues that the court failed to consider evidence that Clark had denied the existence of the Partnership and had taken steps to transfer legal title of the Partnership's primary asset–the ranch–to his name, and had converted over $400,000 of Partnership funds to his own personal use. She further maintains that the court erred in denying her request for expulsion in light of the fact that Clark had instigated criminal theft charges against her in 1994, which later proved frivolous. In response, Clark asserts that the District Court adequately considered each of the events leading to dissociation under § 35-10-616, MCA, and properly denied Joan's request for expulsion.

¶60 Section 35-10-616, MCA, delineates ten events causing a partner's dissociation from a partnership. Pursuant to § 35-10-616(5), MCA, one of the ways a partner may be

21

dissociated is expulsion by judicial decree, made upon the application by the partnership or another partner, because:

> (a) the partner engaged in wrongful conduct that adversely and materially affected the partnership business;
> (b) the partner willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or other partners under 35-10-405, MCA;
> (c) the partner engaged in conduct relating to the partnership business that made it not reasonably practical to carry on business in partnership with that partner[.]

Dissociation under § 35-10-616(5), MCA, is considered wrongful. Section 35-10-617(1)(b)(ii), MCA.

¶61 In this case, Joan's amended complaint did not specifically request relief pursuant to § 35-10-616(5), MCA, and it is evident from the record that the District Court considered her claim generally under § 35-10-616, MCA. In so doing, the District Court found that Clark had not given notice of his express will to withdraw as a partner, that the partnership agreement did not apply, and that Clark had continued to work the ranch since his alleged dissociation in 1994, which Joan and the Partnership had benefitted from. The court further noted that, although Clark had obtained loans in his individual name from 1994 forward, this did not constitute dissociation since it was a necessary action in light of the parties' inability to communicate about ranch finances. Furthermore, the court concluded that Clark had not dissociated from the Partnership by virtue of reporting Partnership gains and losses on his individual tax returns. The court reasoned that Clark had filed the appropriate Partnership tax returns following this Court's decision in *McCormick I*, ¶¶ 67, 84, holding that the deeds

22

transferring the ranch from Joan to Clark were void and the irrevocable trust allegedly established by the parties' father was invalid, and that Clark's prior reliance upon the deeds was reasonable.

¶62 Based upon these findings, which Joan does not dispute, we cannot disagree with the District Court's conclusion that Clark did not dissociate from the Partnership. While Joan contends that the District Court failed to consider evidence that Clark wrongfully converted over $400,000 of Partnership funds to his personal use, it does not appear from the record that Joan raised this argument before the District Court in a timely fashion. Rather, the record shows that these allegations first surfaced following trial and the appointment of a special master.

¶63 Additionally, Joan's contention that Clark dissociated from the Partnership by instigating criminal theft charges against her fails. The District Court weighed this evidence at trial and rejected it, finding that both parties were at least partially at fault for the deterioration of the Partnership. The court also noted that the act of taking alternate legal positions during the course of the dispute did not amount to dissociation. Because Joan has not established that the District Court's findings were clearly erroneous, we conclude the court did not err in concluding that Clark did not dissociate from the Partnership pursuant to § 35-10-616, MCA.

¶64 **Did the District Court err in concluding that the Charolais cattle constituted partnership assets?**

23

¶65     In 1990 Helen Brevig purchased approximately ten head of Charolais cattle to live on the ranch. The following year, Helen transferred ownership of the cattle and the brand to Clark and his two sons. Thereafter, these cattle were listed and treated as Partnership property for all tax purposes, and proceeds from the sale of the cattle's offspring was placed into a Partnership account. Today, all the Charolais cattle residing on the ranch are offspring of those cattle originally purchased by Helen in 1990.

¶66     The issue concerning ownership of the Charolais cattle arose as a result of the special master's treatment of the cattle as Partnership assets in his accounting. At trial, Clark argued that the Charolais cattle should be regarded as separate property due to the fact that his mother, who was not a partner, had gifted the cattle to Clark and his two sons, neither of whom are partners. The District Court concluded, however, that since Clark had signed tax returns indicating that the cattle were Partnership property, and had placed proceeds from the sale of calves into Partnership accounts, the cattle should be treated as Partnership assets.

¶67     On cross-appeal, Clark challenges the District Court's characterization of the Charolais cattle as Partnership assets, and argues that the mere inclusion of the cattle in the Partnership tax returns is legally insufficient to transfer title of the cattle to the Partnership. We agree.

¶68     Section 35-10-203, MCA, pertains to partnership property and provides as follows:

> (1) Property transferred to or otherwise acquired by a partnership is property of the partnership and not of the partners individually.
> (2) Property is partnership property if acquired in the name of:

(a) the partnership; or

(b) one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.

(3) Property is acquired in the name of the partnership by a transfer to:

(a) the partnership in its name; or

(b) one or more partners in their capacity as partners in the partnership if the name of the partnership is indicated in the instrument transferring title to the property.

(4) Property is presumed to be partnership property if purchased with partnership assets even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.

(5) *Property acquired in the name of one or more of the partners without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets is presumed to be separate property even if used for partnership purposes*.

(Emphasis added.) As reflected in the statute, property purchased with partnership assets, or transferred in the partnership's name, or to one or more of the partners in their capacity as partners of the partnership, is presumed to be partnership property. On the other hand, property acquired in the name of a partner without an indication that the property is being transferred to that person in his or her capacity as a partner of the partnership is presumed to be separate property, even if used for partnership purposes. *See* § 35-10-203, MCA.

¶69 In the present case, special master Blakely included the cattle as partnership assets in his accounting because they were listed on the partnership tax returns. However, nothing in the record suggests that the Charolais cattle were purchased with Partnership assets or transferred to Clark and his two sons in their capacity as partners of the Partnership. Nor has

25

their been any assignment of the cattle to the Partnership. Therefore, despite the fact that the cattle were included in the Partnership tax returns, and proceeds from the sale of the cattle's offspring placed in Partnership accounts, the cattle are to be presumed separate property pursuant to § 35-10-203(5), MCA.

¶70 As Joan correctly points out, this presumption is a rebuttable one. Nonetheless, Joan did not introduce any evidence to overcome the presumption but, rather, has relied on appeal upon the District Court's findings that money from the sale of calves had been placed into Partnership accounts, and that the cattle had been listed on Partnership tax returns. However, we have previously considered and rejected arguments that a third party acquires an interest in cattle simply by feeding, watering, and pasturing them. In *In re Marriage of Schultz* (1982), 199 Mont. 332, 649 P.2d 1268, the respondent in a divorce proceeding claimed he had an interest in a cattle brand which had been transferred to the parties' daughter because he had fed and watered the cattle and had taken care of them on his land. The respondent cited no authority in support of his contentions and, on appeal, we held that his claim was meritless. We further noted that proceeds from the sale of the daughter's calves had been used by the ranch in its operation, and thus concluded that the respondent had been equitably compensated for his contributions. *Schultz*, 199 Mont. at 338, 649 P.2d at 1271.

¶71 As in *Schultz*, here proceeds from the sale of calves had been deposited in Partnership accounts and used for Partnership purposes. Joan has not demonstrated any equitable interest in the cattle by virtue of the Partnership's care and feeding of the cattle, nor has she provided any authority which would compel the conclusion that ownership of the cattle

26

passed to the Partnership. Because the presumption established by § 35-10-203(5), MCA, has not been overcome by evidence to the contrary, we conclude the District Court erred in categorizing the Charolais cattle as Partnership assets, and reverse the court's determination in that regard.

**¶72 Did the District Court err by excluding evidence of a teleconference and concluding that Clark was not entitled to compensation?**

¶73 Clark asserts that the District Court erred in excluding evidence of a taped telephone conference between himself, Helen, Joan, and two accountants, which allegedly contained Joan's admission that Clark should receive a salary as ranch manager in the amount of $24,000 per year. The District Court excluded the taped testimony on the ground that it was not clear that all persons involved in the conversation were aware that it was being tape-recorded, in violation of § 45-8-213, MCA, which pertains to privacy in communication. The court further found that the tape recording offered by Clark as evidence in support of his claim that Joan had agreed to pay him a salary had been intentionally altered, and therefore lacked the necessary foundation to be authenticated under Rule 901, M.R.Evid. Because we conclude the District Court correctly denied admission of the proffered evidence on the grounds that it was incapable of being authenticated, we decline to address whether it was also proper for the court to exclude the tape recording pursuant to § 45-8-213, MCA.

¶74 The requirement of authentication or identification is a condition precedent to admissibility. Rule 901, M.R.Evid. In *State v. Warwick* (1972), 158 Mont. 531, 542, 494 P.2d 627, 633, this Court set forth the standards for admissibility of sound recordings. They

27

are (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of authenticity and correctness of the recording, (4) a showing that changes, additions or deletions have not been made, (5) a showing of the manner of the preservation of the recording, and (6) identification of the speakers.

¶75 In this case, the District Court found that the tape recording had been intentionally altered so as to capture only certain phrases or sentences from the original recording and the original version of the recording was no longer available. Consequently, it was impossible to authenticate the recording pursuant to the standards set forth in *Warwick.* As we have often noted, a district court has broad discretion in determining whether evidence is relevant and admissible and we will not overturn that determination absent an abuse of discretion. *Glacier Tennis Club at Summit, LLC v. Treweek Const. Co., Inc.*, 2004 MT 70, ¶ 47, 320 Mont. 351, ¶ 47, 87 P.3d 431, ¶ 47. Here, Clark has not even attempted to discredit the District Court's findings that he intentionally altered the tape. Accordingly, we conclude the District Court was correct to deny admission of the tape recorded conversation.

¶76 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY

28

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER