121 P.3d 1227 (2005)
Cecilia A. HORNE, a single person, Respondent and Cross Appellant,
v.
Steven E. AUNE, a single person, Appellant and Cross Respondent.
No. 31896-2-II.
Court of Appeals of Washington, Division 2.
November 1, 2005.
*1228 Steven E. Aune (Appearing Pro Se), Gig Harbor, WA, for Appellant.
Christopher Marti Constantine of Counsel Inc, Tacoma, WA, for Respondent/Cross-Appellant.
HOUGHTON, J.
¶ 1 In this appeal, we are asked to decide whether in winding up a partnership, the Revised Uniform Partnership Act (RUPA), chapter 25.05 RCW, requires a public sale of partnership property; or whether the court may instead allow a partner to purchase the property for its agreed value with cash payment to the other partner of his partnership interest?
¶ 2 Steven Aune appeals a court order requiring him to sell his one-half partnership interest in real property to Cecilia Horne. He demands a public sale of the property, with cash distribution of the proceeds.
¶ 3 Because RUPA's winding-up provision, RCW 25.05.330, does not mandate a public sale of partnership property as the only means of liquidating partnership assets, we affirm. And given the facts of this case, we hold the trial court did not abuse its discretion by allowing Horne to purchase the property instead of listing her home with a real estate agent.
¶ 4 Horne cross-appeals the dismissal of her breach of fiduciary duties, breach of contract and conversion claims, and denial of her motion for a continuance. We affirm.

FACTS
¶ 5 In July 2002, when Horne and Aune intended to pursue a family life together, they purchased property in Gig Harbor as tenants in common. As experienced real estate investors, they viewed the $303,500 purchase as an investment opportunity. Each contributed equally toward the down payment and obtained joint financing for the balance.
¶ 6 Horne, Aune, and Horne's son, William (then 12 years old), moved into the house in August 2002. Horne and Aune experienced relationship troubles almost immediately. Aune refused to pay half the utilities because he believed Horne and her son consumed more than half. In October, Aune and Horne argued during a road trip, and Aune left Horne and her son by the side of the road in Port Angeles.
¶ 7 On November 4, they signed a written agreement describing their respective rights and obligations for the property. Horne drafted the agreement. It opens with, "This will serve as the legal jargon to indicate that this is a legal and binding agreement which supersedes any other legal and binding agreements, obligations, encumbrances or matters of inheritance involving [the property]." Clerk's Papers (CP) at 200. The agreement states that Horne and Aune "are equal partners in said property sharing equally in ownership, care, upkeep and title and mortgage obligations including property taxes and property insurance costs." CP at 200. The agreement provides that both parties would deposit sufficient funds in a joint bank account to pay property expenses. Both parties agreed to maintain life insurance policies to cover their mortgage obligation and to submit any disputes to mediation.
¶ 8 Finally, the agreement has the following provision:

*1229 [6.] If either party is lawfully, but unwillingly removed from the property by law enforcement or by invoking a restraining order or any other method, the party remaining in residence will be solely financially responsible for upholding all expense obligations pertaining to the mortgage, taxes, insurance and care and upkeep of the property until the removed party returns and peaceable co-habitation resumes. Upon return, both parties will resume the equally shared obligations of this real estate agreement as stated herein.
CP at 200.
¶ 9 The parties dispute which of them formulated this language, but they do not dispute that Horne drafted the document and both of them signed it in the presence of a notary. Horne understood that Aune wanted this provision because his ex-wife had obtained a protection order against him during their marital dissolution, forcing him out of the home that he had built and lived in. He believed that he had been treated unfairly and wanted to ensure that the same thing would not happen to him again.
¶ 10 On December 8, an altercation occurred at the home. During an argument, Aune pushed Horne aside and assaulted her son, William.[1] Both William and Horne called 911. Aune left. A deputy sheriff took a report and referred it to the prosecutor's office. Aune returned and, at Horne's urging, left on a trip five days later for a "cooling off period" to visit his brother in the Midwest. 3 Report of Proceedings (RP) at 297. While he was gone, Horne obtained a protection order against him. The prosecutor charged Aune with two counts of fourth degree assault.
¶ 11 Horne gave the sheriff Aune's return flight schedule. Two deputies arrested Aune when his plane landed at Sea-Tac airport on December 23, 2002. He entered an Alford plea and received a deferred sentence. North Carolina v. Alford, 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (holding that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the act constituting the crime"). As a condition of his deferred sentence, he could have no contact with Aune or William. Also, a protection order remained in effect through the time of trial, with a limited exception to discuss property settlement.
¶ 12 Horne and Aune had a joint bank account in which they deposited monies for payment of house expenses. They both paid house expenses through December 2002, except that Aune continued to dispute his share of the utilities bill. Aune did not contribute toward household expenses following his arrest.
¶ 13 Horne has remained in possession of the home and has paid all expenses, including the mortgage, since January 2003. Horne asked Aune to continue to pay half of the home expenses but he refused, invoking paragraph 6 of the partnership agreement.
¶ 14 Horne and Aune unsuccessfully sought to mediate in spring 2003. In April 2003, Horne sent Aune a letter purporting to nullify the partnership agreement. Aune did not respond.
¶ 15 Horne sued Aune in September 2003. Her claims included: breach of partnership agreement; breach of fiduciary duty; accounting, dissolution, and winding up of partnership; and conversion/replevin. She alleged that the partnership could no longer function, necessitating a winding up and dissolution. She requested that the real property be sold and that she be permitted to purchase Aune's interest in the property at a reasonable sum to be determined by the court.
*1230 ¶ 16 In his answer, Aune admitted that the partnership should be dissolved and wound up, but he denied that he had breached the agreement or any fiduciary duty. He requested a formal accounting, followed by a judgment for his share of the partnership property.
¶ 17 Horne and Aune attempted to mediate the lawsuit issues in March 2004. Both parties agreed that it would be better for one or the other to buy the house rather than publicly sell it in order to avoid the transaction costs of a public sale. But they were unable to agree on who would buy out whom, or at what price. Horne wanted to buy out Aune by repaying his down payment of $30,830. Aune wanted to buy out Horne but refused to make a firm commitment until he had an opportunity to inspect the house. Horne did not want Aune at the house and refused to permit him to inspect the property or retrieve his personal belongings. Horne also resisted efforts to have the house appraised, but an appraiser eventually valued the house at $335,000. Both parties agreed to the appraisal's accuracy.
¶ 18 Trial was set for March 25, 2004. On March 8, Horne took Aune's deposition. A week before trial, she discharged her attorney and entered a notice to proceed pro se. Two days before trial, Horne requested deposition transcripts. She was unable to obtain them in time for trial.
¶ 19 Trial occurred March 25, 26, 29, and 30, 2004. Horne requested a continuance because she did not have the deposition transcripts. The trial court denied the motion.
¶ 20 At trial, Horne agreed that the fair rental value of the property exceeded her expenditures during the time she retained exclusive possession and use of the property.
¶ 21 Horne testified that Aune had taken several of her personal belongings, including a cellular telephone, mailbox key, and some tools. Aune testified that he did not.
¶ 22 The court found the written partnership agreement valid and enforceable, including paragraph 6. The court also decided that Horne failed to prove breach of fiduciary duty, breach of contract, or conversion. The court valued the property at $335,000, with a mortgage balance of $235,000. The court concluded that the partnership had $100,000 equity in the home and each party would receive 50 percent of the gross equity and/or net proceeds on its sale.
¶ 23 The court ordered that the partnership was dissolved and should be wound up and that the property should be sold, with each party receiving 50 percent of the net proceeds. The court further ordered that, in lieu of a public sale, the partnership could be wound up by either party buying out the other's interest for $50,000 within 45 days. The order provided that if neither party elected to purchase the property, or if the parties were "deadlocked," the property would be listed for sale with a licensed real estate agent, to be sold publicly, with distribution of the proceeds.
¶ 24 Both parties wanted to purchase the property and each tendered $50,000. Horne presented pre-approval for a loan to purchase the property. Instead of ordering the property publicly sold, the court held an evidentiary hearing to determine who could purchase it. The court stated that it was "inclined" to give Horne priority over Aune, provided she could present evidence at the hearing of her ability to pay Aune in cash and assume the mortgage. RP (Apr. 23, 2004) at 11. Aune objected, requesting that either he receive first right or the property be listed and sold publicly.
¶ 25 At the hearing, both Horne and Aune presented reasons why they should be allowed to purchase the property.
¶ 26 Following the hearing, the court determined that the property would not be sold to wind up the partnership. Instead, the court ordered Horne to buy Aune's partnership interest for $50,000. The court ordered Aune to quitclaim his interest to Horne in exchange for the cash payment and a release from his mortgage obligation.
¶ 27 Aune appeals and Horne cross-appeals.

ANALYSIS

AUNE'S APPEAL

APPLICATION OF RCW 25.05.330
¶ 28 Aune first contends that the court impermissibly ordered a distribution in *1231 kind by requiring him to quitclaim his interest in the property to Horne in exchange for a cash payment. He asserts that, in the absence of agreement, a court must order a public sale of partnership property to wind up a partnership.
¶ 29 The question raised is whether RUPA requires a public sale of partnership property to wind up a partnership.[2] This question involves statutory interpretation that we engage de novo. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 555, 14 P.3d 133 (2000).
¶ 30 Partnership law in Washington originally derived from common law and courts had broad equitable powers to resolve partnership disputes. Watson v. Matchett, 182 Wash. 544, 47 P.2d 1001 (1935). But in 1945, Washington adopted the Uniform Partnership Act (UPA), former chapter 25.04 RCW. Laws of 1945, ch. 137. Since then, the court's equitable discretion has been subject to partnership statutes. Guntle v. Barnett, 73 Wash.App. 825, 837, 871 P.2d 627 (1994).
¶ 31 Under UPA, the departure of any partner resulted in dissolution and winding up, absent agreement to the contrary. It had been unclear under the common law whether, on winding up, partners were entitled to cash distribution of their partnership interest, as opposed to physical partition of the surplus property. Disotell v. Stiltner, 100 P.3d 890, 894 (Alaska 2004) (citing Uniform Partnership Act § 38 cmt. (1914)). UPA resolved the ambiguity by providing that each partner was entitled to cash distribution.
¶ 32 In 1998, Washington adopted RUPA. RUPA limits the circumstances under which a partnership must dissolve and be wound up following the departure of a partner. When a partner dissociates from a partnership, remaining partners generally may elect to either buy out the exiting partner's interest and continue the partnership business, or else dissolve and wind up the partnership. RCW 25.05.235. But when partners choose the path of dissolution and winding up, the procedures are substantially the same under RUPA as they were under UPA.
¶ 33 RCW 25.05.330 governs winding up of partnership business. It provides in part:
(1) In winding up a partnership's business, the assets of the partnership, including the contributions of the partners required by this section, must be applied to discharge its obligations to creditors, including, to the extent permitted by law, partners who are creditors. Any surplus must be applied to pay in cash the net amount distributable to partners in accordance with their right to distributions under subsection (2) of this section.
(2) Each partner is entitled to a settlement of all partnership accounts on winding up the partnership business. In settling accounts among the partners, profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any *1232 excess of the credits over the charges in the partner's account.
(emphasis added).
¶ 34 No Washington court has construed this statute. But in Guntle, we considered UPA's analogous winding-up statute, former RCW 25.04.320 (1997) (Each partner is entitled to have "the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."). 73 Wash.App. at 833, 871 P.2d 627.
¶ 35 Guntle involved a partnership consisting of Guntle, his son, and his son's wife, created to purchase and operate a fish processing business and boat launch facility. Guntle sued for an accounting and distribution of partnership assets. After valuing the partnership assets and debts, the trial court awarded specific partnership property to each party. The trial court also ordered Guntle's son and daughter-in-law to assume and pay a promissory note, secured by a mortgage on Guntle's personal property, which Guntle had issued to borrow the funds he contributed to the partnership. Finally, the trial court awarded a money judgment to Guntle, but without specifying how it derived the sum. Guntle, 73 Wash.App. at 829 n. 8, 871 P.2d 627.
¶ 36 Guntle argued on appeal that the court could not distribute the partnership assets and debts in kind, but should have sold the assets, liquidated the debts, and distributed any surplus in cash. Guntle, 73 Wash.App. at 831, 871 P.2d 627. We agreed, holding that "[t]he trial court was not authorized to distribute partnership assets and debts in kind absent consent of all concerned." Guntle, 73 Wash.App. at 834, 871 P.2d 627. We remanded for the trial court to distribute partnership assets and debts by having "`the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners,'" as the applicable statute required. Guntle, 73 Wash.App. at 837, 871 P.2d 627 (quoting former RCW 25.04.380(1)).
¶ 37 Aune argues that, just as in Guntle, the trial court failed to apply applicable partnership statutes, but it instead ordered a distribution in kind of partnership assets to Horne based on improper equitable considerations. Aune construes Guntle too broadly. Guntle's holding is actually very narrow.
¶ 38 In Guntle, we did not interpret the statute, but rather, we remanded for the court to apply it. Guntle does not hold that the phrase have "the partnership property applied to discharge its liabilities" means that the court must order a public sale of partnership property. It merely holds that, in winding up a partnership, the court cannot distribute partnership assets and debts in kind, as it would in a marital dissolution, but must have "the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners." Guntle, 73 Wash. App. at 837, 871 P.2d 627 (quoting former RCW 25.04.380(1)).
¶ 39 Guntle did not resolve the central issue here: whether the winding-up statute necessarily requires a forced sale of partnership assets, as opposed to permitting a partner to purchase the property, with cash payment to the other partner of his interest. This issue is one of first impression. Other jurisdictions are split.
¶ 40 Aune urges us to follow Montana's Supreme Court where it held that RUPA's winding-up provision requires liquidation of partnership assets through a forced sale. McCormick v. Brevig, 322 Mont. 112, 96 P.3d 697 (2004). McCormick involved a family farm, held in partnership by a brother and sister. The sister sued for an accounting, dissolution, and winding up. The trial court ordered the partnership dissolved and wound up. But the trial court ordered that the brother could purchase his sister's share, according to its appraised value, instead of liquidating the partnership assets by selling the ranch and distributing the proceeds. In so ruling, the trial court relied on a dictionary definition of "liquidation" to conclude that it can mean something other than a forced sale of partnership property, i.e., a judicially ordered buy out of a partner's interest. McCormick, 96 P.3d at 703-04.
¶ 41 In reversing, the Montana Supreme Court rejected the trial court's resort to the *1233 dictionary, reasoning that the plain meaning of "liquidation of the partnership assets" is to reduce the partnership assets to cash, pay creditors, and distribute the cash surplus to partners. McCormick, 96 P.3d at 703-04. The court suggests that, because RUPA provides one track for buy out and another for dissolution and winding up, the legislature did not intend to permit a buy out where partners opt for dissolution.
¶ 42 Horne urges us to follow Alaska, Maryland, Oregon, and other states that have permitted a broader interpretation of the winding-up provision.
¶ 43 These jurisdictions hold that, while winding up generally has been equated with the forced sale of partnership assets, the statute does not strictly require such a result. Historically, the purpose of forced sale was to accurately determine the value of partnership assets. In reality, forced sale often results in economic waste. Thus, courts have accepted alternatives to forced sale as a means of winding up partnership business. Some courts have permitted distribution in kind. Logoluso v. Logoluso, 233 Cal.App.2d 523, 43 Cal.Rptr. 678, 682 (1965) (distribution in kind permissible absent great prejudice to the parties); Kelley v. Shay, 206 Pa. 208, 55 A. 925 (1903) (distribution in kind ordered where one party would have unfair advantage over the other in liquidation sale). Others have permitted a buy out. Nicholes v. Hunt, 273 Or. 255, 541 P.2d 820 (1975) (buy out permissible means of winding up, under UPA, where compelled liquidation would result in economic waste).
¶ 44 In Disotell, 100 P.3d 890, the Alaska Supreme Court affirmed a trial court's order permitting a partner to buy out another's partnership interest in lieu of compelled liquidation. Disotell involved a partnership between a contractor and a real estate agent, Stiltner, to develop a hotel on property Stiltner owned. Disagreements arose and Stiltner sued for dissolution and winding up. Instead of ordering a forced sale of the property, the trial court gave Stiltner the option of purchasing Disotell's partnership interest as a means of winding up the partnership.
¶ 45 The Alaska Supreme Court affirmed, holding that the statute does not absolutely compel liquidation and forbid a buy out.[3] "Under appropriate, although perhaps limited, circumstances, a buyout [sic] seems a justifiable way of winding up a partnership." Disotell, 100 P.3d at 894. A buy-out option reduced economic waste by avoiding the transaction costs of a forced sale; it also guaranteed Disotell a fair value for his partnership interest. Moreover, the property was also Stiltner's residence: the court deemed it inequitable to force him out.
¶ 46 In Creel v. Lilly, 354 Md. 77, 729 A.2d 385 (1999), the Maryland Supreme Court held that neither UPA nor RUPA absolutely requires, on winding up, a forced sale of partnership assets.[4]Creel involved a partnership that dissolved because of a partner's death. The deceased's estate demanded forced sale of the partnership, invoking UPA's winding-up provision. After finding that there was no dispute concerning the value of the partnership assets, the trial court permitted the surviving partners to continue the business on cash payment of the deceased partner's interest.
¶ 47 The Maryland Supreme Court affirmed, siding with the line of cases holding that winding up does not equal forced sale. The court construed UPA's winding-up provision, while expressly noting that the result would be same under RUPA. The court noted that RUPA's reforms primarily target the economic waste of compelled liquidation. In the court's view, where partnership assets can accurately be valued by means other than forced sale, judicial alternatives to forced sale, including buy out, may be an acceptable means of winding up the partnership.
¶ 48 We decline Aune's invitation to follow the Montana Supreme Court's reasoning in McCormick. Instead, we adopt Maryland's approach in Creel. Contrary to McCormick, *1234 the winding-up statute does not plainly mean forced sale. Thus, in our view, the trial court's resort to the dictionary in McCormick was appropriate. According to Black's Law Dictionary, "liquidate" means:
1. To settle (an obligation) by payment or other adjustment; to extinguish (a debt). 2. To ascertain the precise amount of (debt, damages, etc) by litigation or agreement. 3. To determine the liabilities and distribute the assets of (an entity), esp. in bankruptcy or dissolution. 4. To convert (a non-liquid asset) into cash. 5. To wind up the affairs of (a corporation, business, etc.).
949 (8th ed.2004).
¶ 49 As used in RCW 25.05.330, the phrase "liquidation of the partnership assets," guarantees partners the right to receive, in cash, the fair value of their property interest upon winding up and dissolution of the partnership. But that result may be achieved by means other than forced sale. Historically, liquidation equaled forced sale because that was deemed the most accurate method of valuing partnership assets. But where, as here, the parties stipulate to the partnership assets' value, there is no reason to equate liquidation with forced sale.
¶ 50 A key factual distinction between Guntle and this case is that Aune is not being forced to accept property in lieu of cash; he is receiving the full cash value of his partnership interest.[5] Absent a valid dispute concerning the value of the partnership property, he has no legal right, under the winding-up statute, to force the public sale of partnership assets.
¶ 51 Although the court's equitable discretion is subject to partnership statutes, RUPA does not do away altogether with equitable considerations. "Unless displaced by particular provisions of this chapter, the principles of law and equity supplement this chapter." RCW 25.05.020(1). The court's exercise of equitable discretion to grant Horne the right to purchase the property is not inconsistent with the winding-up statute.

HORNE'S CROSS APPEAL

CONTINUANCE
¶ 52 On cross appeal, Horne first contends that the trial court erred in denying her motions for a continuance. She asserts that the trial court abused its discretion in denying her "four separate requests" for a continuance. Respondent's Amended Brief at 42.
¶ 53 The record shows that Horne never clearly requested a continuance. In response to the question, "And you're ready to proceed?" she said, "I have questions for your Honor." 1 RP at 3. Then she stated, "There has been no case conference in this matter." 1 RP at 4. The court determined that, although settlement talks failed, both parties had met the spirit of the case conference requirement.
¶ 54 Horne also said she had not yet received transcripts from her deposition of Aune. Because Horne requested the transcripts just two days before trial, the court denied her request for continuance, stating that she had not been timely in requesting transcripts at the time of the deposition. Then Horne said she could not proceed because of "criminal activity." 1 RP at 7. She said that Aune told her he would not settle until she "expunged" his criminal record. The final request for continuance was, "I have concerns of boundaries of ethics may have been breached by defense counsel." The court replied, "[t]hat's not good cause for a continuance." 1 RP at 8, 9.
¶ 55 We review a trial court's denial of continuance for abuse of discretion. PUD No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 813, 881 P.2d 1020 (1994). A court abuses its discretion when it bases its decision on untenable or unreasonable grounds. In re the Marriage of Muhammad, 153 Wash.2d 795, 803, 108 P.3d 779 (2005).
¶ 56 Of the "four separate requests" for continuance, the only arguable good cause was the unavailability of the deposition transcripts. *1235 Horne appears to be arguing that the continuance should have been granted under CR 40(e).[6]
¶ 57 Horne did not comply with the court rule, which requires an affidavit showing the materiality of the evidence expected to be obtained, that due diligence has been used to procure the evidence and the name and address of the witness or witnesses. Horne discharged her attorney a week before trial, electing to proceed pro se, and she ordered the deposition transcripts two days before trial. Further, she did not state whether or how the deposition transcripts would have contributed to her case. The court did not abuse its discretion in denying Horne's last minute request for a continuance.

BREACH OF PARTNERSHIP AGREEMENT AND BREACH OF FIDUCIARY DUTIES
¶ 58 Horne next contends that the trial court erred by concluding that Aune did not breach his fiduciary duty to Horne or to the partnership. In her view, the following facts provided "compelling evidence" of Aune's breach: his assaulting William; his failing to pay property expenses following his departure from the property; withholding "information revealing a life-long pattern of violent and explosive behavior"; his psychiatric history of "Borderline Personality Disorder with Psychotic features"; his unwillingness to settle their dispute; and his "profiting financially" by paying less money for rent than he would have been obliged to pay while living at the property. Respondent's Amended Br. at 43, 44, 47-48.
¶ 59 First, no evidence in the record supports that Aune has a history of "violent and explosive behavior" or a psychological disorder. Horne offered letters from Aune's ex-wife and brother in support of her allegations to that effect, but the trial court excluded them as inadmissible hearsay. Horne does not challenge that evidentiary ruling on appeal. Further, the record amply supports the trial court's finding that the intransigence of both parties led to the failure of settlement talks. And whether Aune pays less for a rented room than he would if he were living at the house is simply irrelevant to Horne's claims.
¶ 60 Aune did not breach a fiduciary duty to Horne or to the partnership when he assaulted William. A partner owes a fiduciary duty of loyalty and of care to both the partnership and to other partners. RCW 25.05.165. A partner's duty of loyalty is limited to avoiding secret profits, self-dealing, and conflicts of interest. RCW 25.05.165(2)(a)-(c). Aune did not violate his duty of loyalty by assaulting William. A partner's duty of care "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law" in the conduct and winding up of the partnership business. RCW 25.05.165(3). Aune's assault of William may be an intentional tort and a criminal act for which he is personally liable, but he did not commit it "in the conduct of" partnership business. Aune did not violate his duty of care by assaulting William.
¶ 61 Aune did not breach a fiduciary duty to Horne or to the partnership when he refused to contribute to the property expenses after being excluded from the home.
¶ 62 RUPA is a "gap filler" in that it only governs partnership affairs to the extent not otherwise agreed to by the partners in the partnership agreement. Creel, 729 A.2d at 393; RCW 25.05.015.[7] With few exceptions, not applicable here, partners may "write their own ticket."[8] Horne and Aune *1236 agreed that Aune would not have to contribute to the property expenses if he were "lawfully but unwillingly" excluded from the home under authority of a protection order. Horne drafted the agreement herself, and she did so months after disagreements arose between the parties, including the incident in Port Angeles when Aune left her and William by the side of the road. The trial court did not err by concluding that the agreement was valid and enforceable. Per the terms of the agreement, Aune had no continuing obligation to contribute to property expenses after he was "lawfully but unwillingly" excluded from the home. Thus, the trial court did not err in concluding that Aune did not breach the partnership agreement.

CONVERSION
¶ 63 Horne assigns error to the trial court's dismissal of her claim for conversion. At trial, Horne testified that Aune took some of her personal belongings. Aune denied the allegations. The trial court was free to believe Aune and to disbelieve Horne. State v. Thomas, 150 Wash.2d 821, 874, 83 P.3d 970 (2004) (credibility determinations are for the trier of fact and are not subject to review on appeal) (citing State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990)). Thus, Horne's challenge fails.

ATTORNEY FEES
¶ 64 Horne argues that the trial court erred by denying attorney fees. She also seeks fees on appeal.
¶ 65 Attorney fees may only be awarded if authorized by contract, statute, or a recognized ground in equity. Bowles v. Dep't of Ret. Sys., 121 Wash.2d 52, 70, 847 P.2d 440 (1993). Horne argues that attorney fees should have been granted because Aune breached his fiduciary duties. She relies on Hsu Ying Li v. Tang, 87 Wash.2d 796, 557 P.2d 342 (1976), as authority. Following Tang, when a partner breaches his fiduciary duties, a fee award is within the trial court's discretion. Green, 103 Wash.App. at 468, 14 P.3d 795. Because the trial court properly found that Aune did not breach his fiduciary duties, the court correctly denied Horne's request for attorney fees. Similarly, we deny an award of fees on appeal.
¶ 66 Affirmed.
We concur: ARMSTRONG, J., and VAN DEREN, A.C.J.
NOTES
[1] The parties largely agree on what happened. They returned home in the evening to find that the family dog had chewed up a number of household items. Either Aune or William let the dog outside. From an upstairs window, Aune saw William beat the dog with a rake. When William came inside, Aune angrily confronted him. Horne came between them. Aune pushed her aside. William ran to his room. Aune followed him there. Aune grabbed William by the hair and banged his head against the wall several times. William had a raised bump on his head but did not require medical treatment.
[2] As an initial matter, Horne argues that Aune invited error by suggesting a buy-out provision at trial and, thus, should be precluded from challenging the court ordered buy out on appeal. "Under the invited error doctrine, a party may not set up an error at trial and then complain of it on appeal." Casper v. Esteb Enters., Inc. 119 Wash.App. 759, 771, 82 P.3d 1223 (2004) (quoting Lavigne v. Chase, Haskell, Hayes & Kalamon, P.S., 112 Wash.App. 677, 681, 50 P.3d 306 (2002)).

Aune did not invite error by suggesting a buy-out provision. He did not ask the court to compel one party to accept buy out from the other. Rather, he proposed that the partnership could be wound up by either party purchasing the other's interest for $50,000. He suggested that, in the event of a deadlock, the court should order the property sold via a licensed real estate agent. Thus, his buy-out proposal implied the parties' agreement, with forced sale in the case of disagreement. This proposal is consistent with Aune's position on appeal that, absent agreement, RUPA requires a public sale of partnership assets to wind up the partnership.
When both parties tendered the buy-out price, the court held an evidentiary hearing to determine who should be permitted to purchase the property. Aune objected to the hearing, arguing that, in the absence of an agreement between the parties, the court must order the property sold. Only after the court overruled his objection and held the hearing did Aune assert a right to buy the property from Horne. Thus, the invited error doctrine does not apply.
[3] Although Disotell involves UPA, as we note above, the winding-up statute is substantially the same as under RUPA.
[4] The case involved both statutes because RUPA was being phased in by the legislature.
[5] At oral argument, Aune attempted to raise factual disputes about the value of partnership assets, but the record shows that the real estate was the only partnership asset. Both parties stipulated to the value of that asset. The parties' dispute over other property is not properly before this court.
[6] CR 40(e) states in part: "A motion to continue a trial on the ground of the absence of evidence shall only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it, and also the name and address of the witness or witnesses."
[7] RCW 25.05.015(1) states: "Except as otherwise provided in subsection (2) of this section, relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership."
[8] "`The agreement, whatever its form, is the heart of the partnership. One of the salient characteristics of partnership law is the extent to which partners may write their own ticket Relations among them are governed by common law and statute, but almost invariably can be overridden by the parties themselves. As one court has long put it, the agreement is the law of the partnership.'" Seattle-First Nat'l Bank v. Marshall, 31 Wash.App. 339, 347, 641 P.2d 1194, review denied, 97 Wash.2d 1023 (1982) (quoting A. BROMBERG, PARTNERSHIP § 5, at 43 (1968)).