#24091-rev & rem-RWS

**2006 SD 98**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE
DISSOLUTION OF MIDNIGHT STAR
ENTERPRISES, L.P., a South Dakota
Limited Liability Partnership,
By MIDNIGHT STAR ENTERPRISES,
LTD., in its capacity as General Partner.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE WARREN G. JOHNSON
Judge

\* \* \* \*

MICHAEL P. REYNOLDS of
Barker Reynolds Law Firm LLC
Rapid City, South Dakota                    Attorneys for appellant
                                            Midnight Star Enterprises,
                                            LTD.


RICHARD A. PLUIMER
DYLAN WILDE
Brady & Pluimer, P.C.
Spearfish, South Dakota                     Attorneys for appellees
                                            Canevas.

\* \* \* \*

ARGUED OCTOBER 3, 2006

OPINION FILED **11/08/06**

#24091

SABERS, Justice

[¶1.]     Petition for dissolution of a partnership was brought by the general partner. The circuit court found the fair market value of the partnership was $6.2 million and ordered the majority partners to buy the business for that price within ten days or it would be sold on the open market. The general partner sought intermediate appeal raising two issues. Since the circuit court failed to use the hypothetical transaction standard to assess the fair market value of the partnership and ordered a forced sale, we reverse and remand.

## FACTS

[¶2.]     Midnight Star Enterprises, L.P. (Midnight Star) is a limited partnership, which operates a gaming, on-sale liquor and restaurant business in Deadwood, South Dakota. The owners of Midnight Star consist of: Midnight Star Enterprises, Ltd. (MSEL) as the general partner, owning 22 partnership units; Kevin Costner (Costner), owning 71.50 partnership units; and Francis and Carla Caneva (Canevas), owning 3.25 partnership units each. Costner is the sole owner of MSEL and essentially owns 93.5 partnership units.

[¶3.]     The Canevas managed the operations of Midnight Star, receiving salaries and bonuses for their employment. According to MSEL, it became concerned about the Canevas' management and voiced concerns. Communications between the Canevas and the other partners broke down and MSEL decided to terminate the Canevas' employment. MSEL inquired whether the Canevas would participate in an amicable disassociation, but the Canevas declined.

-1-

[¶4.] MSEL then chose to dissolve Midnight Star pursuant to Article X, Section 10.1 of the Limited Partnership Agreement and brought a Petition for Dissolution. In order to dissolve, the fair market value of Midnight Star had to be assessed. MSEL hired Paul Thorstenson (Thorstenson), an accountant, to determine the fair market value. MSEL alleged the Canevas solicited an "offer" from Ken Kellar (Kellar), a Deadwood casino, restaurant, and hotel owner, which MSEL claimed was contrary to the provisions of the partnership agreement.

[¶5.] At an evidentiary hearing, Thorstenson determined the fair market value was $3.1 million based on the hypothetical transaction standard of valuation. Kellar testified he offered $6.2 million for Midnight Star. MSEL argued Thorstenson used the proper valuation standard and Kellar's offer did not establish the fair market value. The circuit court disagreed and found Kellar's offer of $6.2 million to be the fair market value of Midnight Star. The circuit court ordered the majority owners to buy the business for $6.2 million within 10 days or the court would order the business to be sold on the open market.

[¶6.] MSEL appeals. The issues are:

1. Whether Article 10.4 of the partnership agreement requires the Midnight Star to be sold on the open market.

2. Whether the circuit court erred in finding the fair market value of Midnight Star was the actual offer price and not that of a hypothetical transaction.

3. Whether the circuit court abused its discretion by ordering a forced sale of Midnight Star.

## STANDARD OF REVIEW

[¶7.]        Interpretation of a partnership agreement, including the decision to force a sale of the partnership, is a question of law reviewed de novo. Liechty v. Liechty, 231 NW2d 729, 731 (ND 1975) (noting the agreement is the "law of the partnership"). Our review of a circuit court's valuation of property is clearly erroneous. Priebe v. Priebe, 1996 SD 136, ¶8, 556 NW2d 78, 80 (additional citations omitted). Whether the circuit court used the correct method of determining fair market value is a question of law reviewed de novo.

[¶8.]        **1.    Whether Article 10.4 of the partnership agreement requires the Midnight Star to be sold on the open market.**

[¶9.]        Canevas claim the partnership agreement does not allow the general partner to buy out their interest in Midnight Star. Instead, the Canevas argue, the agreement mandates the partnership be sold on the open market upon dissolution. Specifically, Canevas ask this Court to interpret Article 10.4 to require the sale of the partnership. Article 10.4 provides:

> After all of the debts of the Partnership have been paid,
> the General Partner or Liquidating Trustee may
> distribute in kind any Partnership property provided that
> a good faith effort is first made to sell or otherwise dispose
> of such property for cash or readily marketable securities
> at its estimated fair value to one or more third parties
> none of whom is an affiliate of any Partner. The General
> Partner or Liquidating Trustee shall value any such
> Partnership property at its fair market value and
> distribution shall then proceed as if the property had been
> sold for cash at such value with the resulting Net Profits
> and/or Net Losses allocated to the Partners as provided in
> Article VI and subsection 10.3.2 of this Agreement.

[¶10.]    MSEL claims the Canevas interpretation of Article 10.4 renders other provisions of the partnership agreement meaningless.  MSEL points to Article 10.3.1 to demonstrate their position.  Article 10.3.1 provides in part:

> Subject to 10.4 hereof, the assets of the Partnership shall be liquidated as promptly as is consistent with obtaining a fair value therefor, provided that no assets other than cash shall be sold or otherwise transferred for value to the General Partner, Liquidating Trustee, any other Partner, or any Affiliate or Related Person of any of the foregoing unless such assets are valued at their then fair market value in such sale or other transfer and fifteen (15) days prior written notice of such proposed sale or transfer . . . is given to all Partners[.]

[¶11.]    During oral arguments, MSEL claimed we need not interpret whether the partnership agreement provisions required a fair market valuation of Midnight Star or whether the partnership must be sold on the open market.  It claimed we could merely decide whether the circuit court erred in determining the fair market value of the business.  However, if the Canevas interpretation of the partnership agreement provisions is correct, there would be no need to determine the fair market value.  If correct, the value of the partnership would be determined solely by the sale of Midnight Star.  Therefore, we reach the question whether the partnership agreement provisions require a fair market analysis or require a forced sale.

[¶12.]    The partnership agreement is a contract between the partners and effect will be given to the plain meaning of its words.  *Liechty*, 231 NW2d at 731; *see also* Pauley v. Simonson, 2006 SD 73, ¶8, 720 NW2d 665, 668 (noting the contract is interpreted using its language).  "An interpretation which gives a reasonable and effective meaning to all the terms is preferred to an interpretation which leaves a

part unreasonable or of no effect." Nelson v. Schellpfeffer, 2003 SD 7, ¶14, 656 NW2d 740, 744 (citing Restatement (Second) Contracts § 203(a) (1981)). We must "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation." Jones v. Siouxland Surgery, 2006 SD 97, ___NW2d ___ (quoting Hartig Drug Co. v. Hartig, 602 NW2d 794, 797-98 (Iowa 1999)) (internal quotations omitted).

[¶13.]     If we accept the Canevas' interpretation of the partnership agreement, it would mean that Article 10.4 requires the partnership to be placed on the open market and sold to the highest bidder. The plain meaning of Article 10.4 does not command that interpretation. This provision clearly states the General Partner "*may* distribute in kind any partnership property" if the property is first offered to a third party for a fair value. (Emphasis added). While the General Partner *may* offer the property on the open market, Article 10.4 does not *require* it. Simply, the General Partner has to offer the property for sale if it chooses an in kind distribution of assets. Sale is not mandatory.

[¶14.]     This interpretation is reinforced when read together with Article 10.3.1. If the Canevas' interpretation is utilized, it would render Article 10.3.1 meaningless. Article 10.3.1 instructs that "no assets other than cash shall be sold or otherwise transferred to [any partner] unless the assets are valued at their then fair market value in such sale or other transfer" and all partners receive fifteen days prior notice of the proposed sale or transfer. If Article 10.4 requires a forced sale, then there would be no need to have the fair market value provision of Article 10.3.1.

#24091

[¶15.]     We cannot interpret one provision to render another provision meaningless.  Instead, we interpret the partnership agreement to require a sale only if a partner elects to distribute in kind.  However, read as a whole, the partnership agreement does not require a mandatory sale upon dissolution.  Instead, the general partner can opt to liquidate using either a sale or transfer under Article 10.3.1.  This gives meaning to Article 10.3.1's fair market value provision.  Because MSEL decided to pursue dissolution under Article 10.3.1, we decide the correct standard for determining the fair market value of the partnership.

[¶16.]     **2.     Whether the circuit court erred in finding the fair market value of Midnight Star was the actual offer price and not that of a hypothetical transaction**.

[¶17.]     MSEL claims the correct standard for appraising a business is the hypothetical transaction analysis, like the analysis employed by MSEL's expert Thorstenson.  Canevas argue that the circuit court correctly concluded the offer from Kellar represented the fair market value of Midnight Star.

[¶18.]     Fair market value is defined as,

> the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.  Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property.

Internal Revenue Service, Rev Rul 59-60 (1959), 1959 WL 12594.  MSEL argues that since the Revenue Ruling was issued in 1959, "hundreds of courts, tribunals,

textbooks, and articles have reiterated the mandatory requirement for hypothetical analysis."[1]  In fact, MSEL contends that not "a single whiff of authority" can be found that supports the circuit court's decision to ignore the hypothetical transaction standard and instead apply an actual offer to determine the fair market value.

[¶19.]     This Court has not decided a case involving this issue.  However, in *Priebe v. Priebe*, we noted, "Revenue Ruling 59-60 represents the most substantial body of official guidance for valuing an interest in a closely held corporation."  1996 SD 136, ¶15 n7, 556 NW2d 78, 82 n7 (quoting Oldfather, *et. al, Valuation and Distribution of Marital Property*, Vol 2, Ch 22.08[2][a] at 22-110 (1996)).  Moreover, other jurisdictions have employed the hypothetical transaction to arrive at the fair market value in other situations.  In *Heck v. Comm'r*, the United States Tax Court explained the "fair market value is the standard of determining the value of property for Federal estate tax purposes."  83 TCM (CCH) 1181 (2002), 2002 WL 180879, *5.  The court went on to explain that the fair market value uses hypothetical sellers and buyers, "rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the actual buyer or seller."  *Id.* (citing Estate of Newhouse v. Comm'r, 94 TC 193, 218, 1990 WL 17251 (additional citations omitted)).

---

1.     As of October 11, 2006 there were 2109 positive references citing Revenue Ruling 59-60 on Westlaw.  The 3 negative references indicate that the ruling has been modified by Revenue Ruling 65-193, but in a way not applicable to this case.

[¶20.]     Importantly, courts have noted that the fair market analysis does not contemplate actual buyers. In *Estate of Jameson v. Comm'r*, the court stated it was error for the lower court to "assume[ ] the existence of a strategic buyer[.]" 267 F3d 366, 371-72 (5thCir 2001) (additional citations omitted). The court further emphasized that "fair market value analysis depends . . . on a hypothetical rather than an actual buyer." *Id.* at 372.

[¶21.]     MSEL goes to great lengths in its brief to demonstrate why the hypothetical transaction valuation standard, rather than an actual buyer, is the proper standard to determine the fair market value. MSEL lists sound policy reasons why an offer cannot be the fair market value. For example, what if a partnership solicited a "strawman" to offer a low price for the business? What if a businessman, for personal reasons, offers 10 times the real value of the business? What if the partnership, for personal reasons, such as sentimental value, refuses to sell for that absurdly high offer? These arbitrary, emotional offers and rejections cannot provide a rational and reasonable basis for determining the fair market value.

[¶22.]     Conversely, the hypothetical transaction standard does provide a rational and reasonable basis for determining the fair market value. This standard provides the basis by removing the irrationalities, strategies, and emotions from the analysis. Many articles and treatises that discuss fair market value specifically note that removing the irrationalities and biases is one of the rationales for the hypothetical transaction standard. *See* Z. Christopher Mercer, *Valuing Enterprises and Shareholder Cash Flows: The Integrated Theory of Business Valuation*, 7

Valuation Strategies 4, 2004 WL 1091507 (noting that the "[u]se of available control premium studies as a basis for inferring minority interest discounts in a fair market value context is not appropriate, except when strategic buyers are the norm"). "[The world of fair market value] is a special world in which the participants are expected (defined) to act in specific and predictable ways. It is a world of hypothetical willing buyers and sellers engaging in hypothetical transactions." Z. Christopher Mercer & Terry S. Brown, *Fair Market Value v. the Real World*, 2 Valuation Strategies 6, 1999 WL 33327233.

[¶23.]     Finally, Section X of the partnership agreement itself requires a "fair market value" of the assets. The partnership agreement is a contract between the partners and effect will be given to the plain meaning of its words. *Liechty*, 231 NW2d at 731 (noting the agreement is the "law of the partnership"); s*ee also Pauley*, 2006 SD 73, ¶8, 720 NW2d at 668. The partnership agreement does not provide that the value of the business upon dissolution will be the highest and best offer the partnership can obtain.

[¶24.]     The circuit court should have used the hypothetical transaction standard in determining the fair market value of Midnight Star. This standard is backed by years of testing and numerous positive citations endorsing it. Instead of employing the hypothetical transaction standard, the court used a single offer to determine that the fair market value was $6.2 million. It was error for the circuit court to ignore this established standard.[2]

---

2.     MSEL argued that the circuit court erred in accepting Kellar's offer as the fair market value because Kellar admittedly knew nothing about the

(continued . . .)

[¶25.]    3.    **Whether the circuit court abused its discretion by ordering a forced sale of Midnight Star**.

[¶26.]    Since it was error for the circuit court to value Midnight Star at $6.2 million, it was also error to force the general partners to buy the business for $6.2 million or sell the business.  However, because this issue could reappear should there be another appeal of this case after revaluation, we determine whether the circuit court can order a partnership to be sold on the open market when the majority owners want to continue to run the business.

[¶27.]    Other jurisdictions have addressed the issue whether the business must be sold in order to liquidate after dissolution.  Many of these jurisdictions allow the partnership to be sold to the willing partners even after dissolution.  A withdrawing partner can be paid any contributions or profits due, but liquidation does not have to occur after dissolution.  Maras v. Stilinovich, 268 NW2d 541, 544 (Minn 1978); Wathen v. Brown, 189 A2d 900, 903 (Pa 1963).  These jurisdictions have noted that forced sales typically end up in economic waste and the Revised Uniform Partnership Act's[3] reforms primarily targeted the economic waste of compelled liquidation.  In these jurisdictions' views, buyouts and other alternatives to forced sales may be utilized to wind up the partnership.  Horne v. Aune, 121 P3d

---

(. . . continued)
   Midnight Star besides who owned it.  Since we determined the court erred in accepting Kellar's offer as the fair market value on different grounds, we need not discuss this issue.

3.    South Dakota adopted the Revised Uniform Limited Partnership Act in SDCL chapter 48-7.  These provisions also indicate buyout is an acceptable alternative to liquidation.  *See* SDCL 48-7-604 (noting a withdrawing partner

(continued . . .)

1227, 1234 (WashAppDiv 2005), *rev. denied*, 139 P3d 350 (Wash 2006). *See also Maras*, 268 NW2d at 544; *Wathen*, 189 A2d at 903. In *Horne*, the court noted that the phrase "liquidation of partnership assets" merely guaranteed partners receive the fair value of their property interest upon dissolution, but did not require a forced sale. 121 P3d at 1234.

[¶28.]    We have stated that to sell an owner's "property without [his] consent is an extreme exercise of power warranted only in clear cases." Eli v. Eli, 1997 SD 1, ¶15, 557 NW2d 405, 409 (citing Delfino v. Vealencis, 436 A2d 27, 30 (Conn 1980) (additional citations omitted)). That logic is true in this case. The owners of the majority interest, 93.5 partnership units, want to continue the business. Most jurisdictions have allowed the withdrawing partner to be bought out after dissolution and a forced sale is not necessary to liquidate. *See Horne*, 121 P3d 1227; Disotell v. Stilner, 100 P3d 890 (Alaska 2004); Creel v. Lilly, 729 A2d 385 (Md 1999); *Maras*, 268 NW2d at 544; Nicholes v. Hunt, 541 P2d 820 (Or 1975); *Wathen*, 189 A2d at 903.

[¶29.]    We see no reason that rationale should not be applied in this case, especially in view of our construction of the contract provisions in the partnership agreement. Instead of ordering the majority partners to purchase the whole partnership for the appraised value, the majority partners should only be required to pay any interests the withdrawing partner is due. Upon remand, the majority

---

(. . . continued)
        can receive any distribution or interest in the partnership to which he is
        entitled upon withdrawal).

partners should only be required to pay the Canevas the value of their 6.5 partnership units, if any value exists after revaluation. However, if the majority owners refuse to pay any amount owed to the Canevas after revaluation, then a forced sale is appropriate. *See* Fortugno v. Hudson Manure Co., 144 A2d 207, 219 (NJ SupCtAppDiv 1958); Goergen v. Nebrich, 174 NYS2d 366, 370 (NYSupCt 1958).

[¶30.] Since the circuit court erred in assessing the fair market value for Midnight Star and ordering a forced sale for $6.2 million, we reverse and remand for further proceedings consistent with this opinion.

[¶31.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.