# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

RSD AAP, LLC,

　　　　　　　Appellant,

　　　v.

ALYESKA OCEAN, INC; JEFF
HENDRICKS and JANE DOE
HENDRICKS, individually and as a
marital community,

　　　　　　　Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 71926-2-I

ORDER WITHDRAWING OPINION
AND SUBSTITUTING OPINION

The court has determined that the opinion filed on September 14, 2015, should be withdrawn and a substitute published opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on September 14, 2015, be withdrawn and a substitute published opinion be filed.

DATED this 21st day of September, 2015.

　　　　　　　　　　　　　Trickey, J

Spearman, C.J　　　　　　　　　Cox, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RSD AAP, LLC, | ) | No. 71926-2-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | PUBLISHED OPINION |
| ALYESKA OCEAN, INC; JEFF HENDRICKS and JANE DOE HENDRICKS, individually and as a marital community, | ) | |
| Respondents. | ) | FILED: September 21, 2015 |

TRICKEY, J. — RSD AAP, LLC (RSD) is a partner in the Auriga/Aurora General Partnership (AAGP). RSD appeals the trial court's summary dismissal of its lawsuit against another partner, Alyeska Ocean, Inc. (AOI). RSD asserts that the trial court erred by holding that (1) the right of first refusal provision set forth in the partnership agreement was not triggered, (2) the partnership agreement's requirement that written consent from two thirds of the partnership be obtained before encumbering a partnership interest was not breached, and (3) the fiduciary duty of loyalty or good faith and fair dealing was not violated. Finding no error, we affirm.

FACTS

Jeff Hendricks is the sole shareholder of AOI. In 1987, AOI purchased two vessels to convert them for commercial fishing. To raise capital to convert the vessels and prepare them for operation, AOI formed AAGP in 1988. All of the partners who were invited to join AAGP were friends or family of Hendricks.

A general partnership agreement (Agreement) was entered into on February 13, 1988. Article VII of the Agreement involved the transferring of partnership interests. It provided, in relevant part:

> 7.1 <u>Transfer Prohibited</u>.
>
> 7.1.1 No Partner may, without the prior written consent of the Partners holding at least a two-thirds interest in the Partnership (excluding the transferring Partner's interest), directly or indirectly sell, lease, transfer, assign, give, pledge, hypothecate or otherwise encumber or permit or suffer any encumbrance of all or any part of his interest in the Partnership, with or without consideration, except as provided in this Article VII and Section 8.2.
> . . . .
>
> 7.3 <u>Right of First Refusal</u>. Notwithstanding the provisions of Section 7.1.1, a Partner may sell his interest in the Partnership upon compliance with the conditions of Section 7.1.2 and the following conditions:
> . . . .[1]

As set forth in Section 7.3, if a partner decided to accept an offer to purchase his or her partnership interest, the partner was required to provide written notification to the other partners of his or her intention to sell the interest. That notification was to include the terms and conditions of the proposed offer. After receiving the selling partner's notification, the other partners would have 30 days to elect to purchase for themselves the selling partner's interest upon the same terms and conditions in the selling partner's notification. If the other partners elected not to purchase the interest or if they did not respond within 30 days, the selling partner was permitted to effect the sale of his or her interest upon the same terms and conditions contained in the notification to the other.

In addition, the Agreement contained an integration clause:

> 12.3 <u>Governing Law, Miscellaneous</u>. This Agreement is intended to benefit only the parties hereto, constitutes the entire agreement of the parties relative to the formation, operation, termination and dissolution of

---

[1] Clerk's Papers (CP) at 70-71.

the Partnership . . . . There are no promises, terms, conditions or obligations other than those contained herein, and this Agreement supersedes all previous communications, representations or agreements, either verbal or written, between the parties concerning the subject matter hereof. No variations, modifications, or changes herein or hereof shall be binding upon either party hereto . . . .[2]

AOI became the general manager of AAGP under the Agreement and Management Agreement, and has continued to hold that position since the formation of the partnership.

Robert Resoff became an original partner of AAGP through his corporation Robert E. Resoff, Inc. RSD is a wholly-owned subsidiary of, and managed by, Robert E. Resoff, Inc. In 2010, Robert E. Resoff, Inc. transferred its entire 20.618 percent share of its partnership interest to RSD. George Steers is the president of Robert Resoff, Inc.

On April 24, 2012, Hendricks contacted Mark O'Brien, a partner of O'Brien Enterprises, Inc., to ask if he was interested in selling his partnership interest to him. During that conversation, O'Brien informed Hendricks for the first time that he had terminal cancer and only had a few weeks to live. O'Brien was receptive to the notion of selling his interest and suggested that Hendricks give him his "idea" of a purchase price.[3]

On April 30 through May 10, 2012, Hendricks communicated with Clayton Lynch, O'Brien's certified public accountant, about the valuation of O'Brien's interest and determined that a purchase by way of an option would be the best method of accomplishing the transaction. Hendricks forwarded to Lynch an updated valuation of O'Brien's 20.618 percent interest—$3,482,478—that was prepared by Hendicks' accountant. On May 10, Hendricks wrote to Lynch offering to pay $4 million plus

---

[2] CP at 77.
[3] CP at 55.

3

$500,000 for O'Brien's share of the partnership funds held for distribution and in reserve for a pending shipyard expense. Hendricks notified Lynch that his counsel, Doug Fryer, would draft an Option Agreement.

On May 15, 2012, Hendricks sent a letter to the partners alerting them of O'Brien's health condition.[4] He told them that he and O'Brien "agreed that after his death [AOI] would purchase [O'Brien's] corporate interest in the partnership."[5] In the letter, Hendricks attached a "CONSENT AND WAIVER as required by our partnership agreement" to be returned to Hendricks.[6] Hendricks also instructed the partners to "[f]eel free to call if you have questions about the agreement or [O'Brien's] condition."[7]

By May 21, 2012, counsel for O'Brien and Hendricks agreed on a form of Option Agreement to be executed. The Option Agreement stated that it "is entered into as of May 24, 2012."[8] Although the Option Agreement had been executed effective May 24, 2012, according to Hendricks, O'Brien and his wife did not sign it until May 31.[9] The option was not exercisable until O'Brien's death. By May 31, 2012, Hendricks received the consent of two-thirds of the partnership, excluding O'Brien's consent.

On June 4, 2012, Matt Lieske contacted Hendricks about the details of the transaction. Lieske inquired about the value agreed upon for O'Brien's interest. Hendricks replied, providing a detailed explanation of what he believed his valuation of the company was for a sale of a less-than-controlling interest versus the sale of a

---

[4] CP at 117.
[5] CP at 117.
[6] CP at 117-19.
[7] CP at 117.
[8] CP at 121.
[9] The Option Agreement does not indicate the dates on which each party signed it.

controlling interest. On June 6, 2012, Hendricks wired O'Brien $200,000 as consideration to finalize the Option Agreement.

By June 8, 2012, Hendricks had not heard from RSD. Hendricks contacted Twig Mills, one of the Robert E. Resoff, Inc. trustees, to inquire about RSD's consent. Mills responded that George Steers was meeting with the other managers on the week of June 14 to discuss the O'Brien transaction.

On June 20, 2012, Steers wrote to Fryer, asking for the details of the O'Brien purchase. Steers also notified Fryer that RSD may want to exercise its right of first refusal. Fryer responded the next day. He informed Steers that all of the partners had given written approval of the acquisition by AOI of the option to purchase O'Brien's partnership interest. Fryer stated his opinion that under the Agreement, because two-thirds of the partnership had consented, the right of first refusal did not apply. Steers responded by letter dated June 25, 2012, asserting that as a partner, Hendricks was required by the Revised Uniform Partnership Act (RUPA), chapter 25.05 RCW, to meet his fiduciary duties and disclose the terms of the transaction.

O'Brien died on July 9, 2012. Under the Option Agreement, this event triggered the 30-day period for Hendricks to exercise the option to purchase O'Brien's interest in the partnership. On July 10, Fryer received Steers' June 25 letter. Fryer responded that same day with details of the transaction by sending a copy of the Option Agreement and advising Steers that O'Brien had died and Hendricks planned to close the transaction within 30 days.

On July 30, 2012, Fryer received the executed closing documents, including a bill of sale for the O'Brien partnership interest. Hendricks wired the balance of the purchased price shortly after August 2, 2012.

Prior to the acquisition of O'Brien's interest, AOI, O'Brien Enterprises, Inc., and RSD each owned a 20.618 percent partnership interest in AAGP.

On August 8, 2012, Steers advised Fryer that Robert E. Resoff, Inc. had elected to purchase the O'Brien interest on the same terms set forth in Hendricks' Option Agreement.

On February 13, 2013, RSD filed a complaint for declaratory and equitable relief against AOI. RSD alleged breach of fiduciary duty, breach of contract, and interference with business expectancy. In its prayer for relief, RSD requested (1) declaratory relief that its alleged right of first refusal under Section 7.3 of the Agreement be recognized; (2) that the court impose a constructive trust to protect RSD's alleged interest in the O'Brien transaction based upon its purported right of first refusal; and (3) specific performance of the Agreement that would require AOI to make the O'Brien transaction subject to the right of first refusal as determined by Section 7.3 of the Agreement.

AOI moved for summary judgment against RSD. AOI maintained that under the plain language of the Agreement, only where a partner cannot obtain consent from two-thirds of the partnership to a transfer of interest does the right of first refusal apply. AOI argued that because the transfer of O'Brien's partnership interest was approved by two-thirds of the partnership, the right of first refusal was never triggered. The trial court granted AOI's motion for summary judgment.

RSD appeals.

ANALYSIS

We review summary judgment orders de novo. Durland v. San Juan County, 182 Wn.2d 55, 69, 340 P.3d 191 (2014). Summary judgment is appropriate only if there is no genuine issue of material fact in the pleadings, affidavits, and depositions on file, and the moving party is entitled to judgment as a matter of law. CR 56(c). Material facts are those upon which the outcome of the litigation depends. Greater Harbor 2000 v. City of Seattle, 132 Wn.2d 267, 279, 937 P.2d 1082 (1997).

RSD first contends that the trial court's interpretation of the Agreement was erroneous because, it argues, under the Agreement, even where a partner obtains consent of two-thirds of the non-selling partners under Section 7.1.1, it still must comply with the right of first refusal provision set forth in Section 7.3. We disagree with RSD's interpretation of the Agreement.

"The interpretation of a contract can be a mixed question of law and fact. But where the contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law." Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 134, 323 P.3d 1036 (2014) (internal citations omitted).

The touchstone of contract interpretation is the parties' intent. See Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 86, 100, 285 P.3d 70 (2012); 25 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 5:7, at 152 (2d ed. 2007). We construe contracts "to reflect the intent of the parties." Corbray v. Stevenson, 98 Wn.2d 410, 415, 656 P.2d 473 (1982). We follow the "'objective manifestation theory'" of contract interpretation, focusing on the

"'reasonable meaning of the contract language to determine the parties' intent.'" Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014) (quoting Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). "We impute an intention corresponding to the reasonable meaning of the words used." Hearst, 154 Wn.2d at 503.

We also follow the context rule that "extrinsic evidence relating to the context in which a contract is made may be examined to determine the meaning of *specific words and terms*" used in the contract. William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Trust v. Port of Everett, 159 Wn. App. 389, 399-400, 245 P.3d 779 (2011) (emphasis added). Extrinsic evidence includes both the contract's subject matter and objective, the circumstances surrounding contract formation, both the parties' conduct and subsequent acts, and the reasonableness of the parties' respective interpretations. Hulbert, 159 Wn. App. at 400. However, extrinsic evidence may not be used to "'show an intention independent of the [contract]' or to 'vary, contradict[,] or modify the written word.'" Hearst, 154 Wn.2d at 503 (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 693, 974 P.2d 836 (1999)). Moreover, extrinsic evidence of a party's subjective, unilateral, or undisclosed intent regarding the meaning of a contract's terms is inadmissible. Hulbert, 159 Wn. App. at 400. "Nor is it admissible under the parol evidence rule to add to the terms of a fully integrated written contract." Hulbert, 159 Wn. App. at 400.

We "should ultimately give effect to . . . the intent of the parties at the time of execution." 25 DEWOLF & ALLEN, § 5:7, at 154 (2007). If contractual language is "clear

and unambiguous," we must enforce the written contract. <u>Lehrer v. Dep't of Soc. & Health Servs.</u>, 101 Wn. App. 509, 515, 5 P.3d 722 (2000).

The primarily disputed sections of the Agreement are repeated as follows:

> 7.1.1  No Partner may, without the prior written consent of the Partners holding at least a two-thirds interest in the Partnership (excluding the transferring Partner's interest), directly or indirectly sell, lease, transfer, assign, give, pledge, hypothecate or otherwise encumber or permit or suffer any encumbrance of all or any part of his interest in the Partnership, with or without consideration, except as provided in this Article VII and Section 8.2.
>  . . . .
>
> 7.3  <u>Right of First Refusal</u>. *Notwithstanding* the provisions of Section 7.1.1, a Partner *may* sell his interest in the Partnership upon compliance with the conditions of Section 7.1.2 and the following conditions:
>  . . . .[10]

RSD interprets these provisions, in addition to others quoted above, to mean that the right of first refusal in Section 7.3 trumps the two-thirds consent requirement in Section 7.1.1.

The plain language of Sections 7.1.1 and 7.3, when read together, delineates two separate mechanisms of transferring partnership interest.  The first is Section 7.1.1's general requirement that in order to transfer a partnership interest, the partner must obtain written consent of the partners holding at least a two-thirds interest in the partnership. The second mechanism is outlined in Section 7.3, the right of first refusal provision.  The term "notwithstanding" indicates that this is a separate method of transferring interest. "Notwithstanding" is defined as "without prevention or obstruction from or by"; "NEVERTHELESS, HOWEVER, YET." <u>Webster's Third New International Dictionary</u> 1545 (2002).

---

[10] CP at 70-71 (emphasis added).

The term "may" in Section 7.3 also supports this interpretation. It establishes that the right of first refusal procedure is optional, not required. The language of the Agreement does not state that it is mandatory that a transferring partner follow the procedure of first refusal. The Agreement could have done so by mirroring the language of Section 7.1.1. Nor does the Agreement state that Section 7.3 is an additional requirement to Section 7.1.1.

RSD relies on extrinsic evidence to buttress its argument that the Agreement requires a selling partner to comply with the right of first refusal regardless of whether the partner obtained consent from the partnership. For example, RSD focuses attention on a 1987 Offering Memorandum, offered by AOI, which contained a provision regarding the right of first refusal. But resorting to extrinsic evidence such as this is unwarranted. [S]urrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" Hearst, 154 Wn.2d at 503 (quoting Hollis, 137 Wn.2d at 695-96). RSD seeks to modify—not define—the clear terms of the contract to support its interpretation.

The Agreement's language is clear and unambiguous. The consent provision in Section 7.3 is a separate process of transferring a partnership interest from the right of first refusal in Section 7.1.1. The trial court did not err in so concluding.

RSD next contends that material questions of fact remain as to whether AOI complied with Section 7.1.1 of the Agreement. According to RSD, because the Option Agreement is dated May 24, it was on that date that the agreement to grant Hendricks an option became binding and, thus, encumbered O'Brien's partnership interest. RSD

argues, as it did to the trial court, that because May 24 predates May 31, the date that the partners consented to the transfer, AOI failed to comply with Section 7.1.1's requirement that the transferring partner obtain *prior* written consent. RSD did not present evidence refuting the fact that O'Brien signed the Option Agreement on May 31. Its argument was that the Option Agreement was binding on May 24 by virtue of the effective date listed on the agreement.

The trial court based its summary judgment decision on its finding that the Option Agreement became binding when O'Brien signed it on May 31, after two-thirds of the partnership consented to the transaction.

Nevertheless, AOI argues on appeal that the Option Agreement, which is different from a purchase and sale agreement, was not binding on O'Brien until he received the $200,000 consideration on June 6. We agree with this assertion.

> An option to purchase property is a contract wherein the owner, in return for a valuable consideration, agrees with another person that the latter shall have the privilege of buying the property within a specified time upon the terms and conditions expressed in the option. If no consideration passes, the transaction resolves itself into a mere offer which may be withdrawn by the optionor at any time before acceptance by the optionee. But when supported by a consideration, as in the case at bar, the execution of the agreement results in a contract binding upon the optionor which may not be withdrawn by him during the time set forth therein.

Whitworth v. Enitai Lumber Co., 36 Wn.2d 767, 770, 220 P.2d 328 (1950). Accordingly, an option contract is not binding until consideration passes. Here, consideration did not change hands until June 6, when Hendricks wired O'Brien $200,000. The trial court did not err. See Wendle v. Farrow, 102 Wn.2d 380, 382, 686 P.2d 480 (1984) (reviewing court may affirm the trial court's judgment on any theory established by pleadings and supported by proof).

RSD further contends that there was no evidence that Hendricks obtained *written* consent from the partners. RSD asserts that the trial court misread Hendricks' declaration. In Hendricks' declaration, he stated, "By [May 31] I had the consent of 2/3 of the partners excluding the transferring partner."[11] However, in its summary judgment motion, AOI also attached a copy of the consent forms mailed to the partners. Additional evidence offered by AOI on summary judgment demonstrated that the consent was in written form. Furthermore, RSD presented no evidence that contradicted AOI's evidence that the consent was in writing. A trier of fact could reasonably infer, based on this evidence, that AOI properly obtained consent in writing from the partners. The trial court correctly concluded that no material question of fact remained as to whether the consent received was in writing and obtained prior to encumbering O'Brien's partnership interest, as required by Section 7.1.1. of the Agreement.

RSD contends, finally, that the trial court erred by summarily dismissing his claim that Hendricks breached his duties of loyalty and good faith and fair dealing to the partners and partnership. We disagree.

Partners are accountable to each other and the partnership as fiduciaries. Bishop of Victoria Corp. Sole v. Corporate Bus. Park, LLC, 138 Wn. App. 443, 457, 158 P.3d 1183 (2007). One of the duties owed as a fiduciary is the duty of loyalty, which includes refraining from self-dealing, secret profits, and conflicts of interest. Bishop, 138 Wn. App. at 457 (citing RCW 25.05.165(2)(a)-(c)). A partner also has an obligation of good faith and fair dealing to discharge duties to the partnership and other partners under the terms of the partnership agreement. RCW 25.05.165(4).

---

[11] CP at 56.

RUPA governs partnership affairs to the extent not defined in the partnership agreement. Horne v. Aune, 130 Wn. App. 183, 200-01, 121 P.3d 1227 (2005); RCW 25.05.165. RUPA is considered a "gap filler" in this manner. Horne, 130 Wn. App. at 200-01. "With few exceptions . . . partners may 'write their own ticket.'" Horne, 130 Wn. App. at 200-01 (internal quotation marks omitted) (quoting Seattle-First Nat'l Bk. v. Marshall, 31 Wn. App. 339, 347, 641 P.2d 1194 (1982)). Included within those exceptions is the duty of loyalty under RCW 25.05.165(2). RCW 25.05.015(2)(c) prohibits a partnership agreement from eliminating the duty of loyalty under RCW 25.05.165(2). Partnership agreements also cannot "[u]nreasonably reduce the duty of care under RCW 25.05.165(3)," or "[e]liminate the obligation of good faith and fair dealing under RCW 25.05165(4)." RCW 25.05.015(2)(d), (e).

RSD contends that Hendricks breached the duty of loyalty because, he argues, the opportunity to purchase the O'Brien interest was a "partnership opportunity." RSD points to Section 8.2 of the Agreement, which gave the partnership an opportunity to purchase a partner's interest upon his or her death. Section 8.2 of the Agreement provided:

> Upon the death . . . of any partner, the Partnership shall continue the Partnership business under its then present name. . . . The Partnership may elect to (but need not) liquidate the interest of the . . . deceased . . . Partner and cause the Partnership to purchase the interest of the . . . deceased . . . Partner at a purchase price equal to 100% of the Value of the . . . deceased . . . Partner's interest . . . .[12]

Notably, not one partner expressed an interest in purchasing O'Brien's partnership interest for the benefit of the partnership. Hendricks informed the partners of the

---

[12] CP at 74.

13

transaction in his May 15, 2012 letter to them, and gave them the opportunity to inquire further about the details of the transaction. Had any of the partners been interested in purchasing the interest for the partnership as a "partnership opportunity," they could have taken action to do so. RSD communicated its interest in purchasing the O'Brien interest weeks after having been informed of the transaction. And RSD sought to purchase the interest on its own behalf as an individual partner, and not on behalf of the partnership interest.

RSD also argues that Hendricks failed to disclose the material terms of the transaction before seeking timely, informed consent from the partners. The good faith obligation of a partner includes a duty of candor, which demands that the partner abstain from any and all concealment concerning matters pertaining to the partnership business and to refrain from making false statements to a copartner. Bovy v. Graham, Cohen & Wampold, 17 Wn. App. 567, 570-71, 564 P.2d 1175 (1977) (citing Karle v. Seder, 35 Wn.2d 542, 214 P.2d 684 (1950)). Hendricks satisfied the good faith obligation by promptly informing the partners of O'Brien's impending death and the deal upon which they agreed. Indeed, Hendricks eventually disclosed the details of the transaction to RSD.

RSD cites Bovy for the proposition that as managing partner Hendricks is held to the highest standard of fiduciary obligation. In Bovy, Division Two stated in a footnote, "We also note that as managing partner, Bovy occupied a higher fiduciary position and had the burden of dispelling all doubts concerning the discharge of his duties. In the event a managing partner is unable to satisfy this burden, all doubts would ordinarily be resolved against him." 17 Wn. App. at 571 n.3 (citing Conrad v. Judson, 465 S.W.2d 819

14

(Tex. Civ. App. 1971); Bakalis v. Bressler, 1 Ill. 2d 72, 115 N.E.2d 323 (1953)). No Washington case has adopted this proposition since Bovy. Because it is merely dicta, we do not apply this proposition for the first time here.

RCW 25.05.165(5) states that no duty is violated under either RUPA or a partnership agreement "merely because the partner's conduct furthers the partner's own interest." AOI did not violate the duty of loyalty or any other obligation imposed because it sought an opportunity for itself as a partner in the enterprise.

We reject RSD's claim that AOI breached its fiduciary duties. The trial court did not err.

We affirm.

Trickey, J

WE CONCUR:

Spectrum, C.J.

Cox, J.

15