**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| CR CONSTRUCTION, LLC, a Washington limited liability company, | No. 84584-5-I |
| Plaintiff, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CORSTONE CONTRACTORS LLC, a Washington limited liability company, | |
| Respondent, | |
| SHERLOCK INVESTMENTS - DUVALL, LLC, a Washington limited liability company, | |
| Appellant, | |
| THE HANOVER INSURANCE COMPANY, bond no. BL21050154; ALASKA USA FEDERAL CREDIT UNION, and MERCHANTS BONDING COMPANY (MUTUAL), | |
| Defendants. | |

MANN, J. — In this breach of contract case between a property owner, Sherlock

Investments Duvall, LLC (Sherlock), and a general contractor, Corstone Contractors

LLC (Corstone), Sherlock appeals multiple decisions by the trial court and a jury verdict

in favor of Corstone. We reverse the trial court's order denying Sherlock's CR 50 motion, order on judgment and offset, and order awarding Corstone attorney fees. We remand for further fact finding on whether Corstone had a right to delay day damages, and for further consideration of attorney fees.

I

In 2018, Sherlock hired Corstone as the general contractor to construct a multistory self-storage facility (project) in Duvall, Washington.[1] As general contractor, Corstone was in charge of contracting with subcontractors. Corstone contracted with CR Construction, LLC (CR), to, among other things, conduct excavation work on the project.

David Beal, Sherlock's founder, had contracted with several subcontractors before Corstone became the general contractor. Beal acted as contract administrator for the project and was responsible for approving pay applications and approving or disapproving change orders.[2] Beal visited the job site regularly.

Work on the project began in March 2018. Under the primary contract the project had to be completed within 365 days. But in April 2018 Sherlock issued a stop work order because of issues with financing. Corstone notified all subcontractors to stop work by end of day April 13, 2018.

---

[1] The contract consisted of a standard form agreement between owner and contractor (A101-2007), general conditions of the contract for construction (A201-2007), Corstone's February 23, 2018, bid proposal letter, and February 26, 2018, supplemental conditions to construction contract which modified the general conditions A201-2007.

[2] A change order "is a written instrument prepared by the Contractor and signed by the Contractor and Owner, and may be signed by the Architect at the Owner's discretion, stating their agreement upon the following:
.1 The change in the work
.2 The amount of the adjustment, if any, in the Contract Sum; and
.3 The extent of the adjustment, if any, in the Contract Time.

Before work stopped, CR was on-site cleaning up garbage, removing a house and shop that was on the property, removing concrete, preparing a gravel construction entrance, and excavating and flattening the soil for pile work. Once Sherlock issued the stop work order, CR had to prepare the site for weather problems to make sure that no water left the site, including a requirement from the City to create a dispersal trench for groundwater. This essentially turned a portion of the job site into a pond.

On July 19, Sherlock notified Corstone that it had obtained all required permits, the loan was executed, and the project could be resumed. Corstone's project manager created a new construction schedule. None of the subcontractors indicated any issues resuming the work or requiring more time or money to complete the work. The project officially resumed on August 6, 2018. The amended completion date was June 16, 2019.

In August 2018, Corstone submitted change order 11 to Sherlock for CR's remobilization costs. The change order included no additional days to be added to the contract time. Sherlock paid these costs. As of that time, Corstone did not have concerns with meeting the project's schedule.

Because the project resumed in the wetter fall and winter months, the suitability of the on-site soil decreased. This created complications for placing foundations and slabs and for access to the job site.

Sherlock's consultant, Geotech Consultants, Inc. (GCI), was often on-site reviewing the work and submitting daily reports to Sherlock and Corstone. The geotechnical engineer performed inspections of the soil and directed the contractors on what to do with the soil.

In fall 2018, as CR continued to work on-site, it submitted several change orders to Corstone. This included CR's change order 11 to extend the construction road at Corstone's direction. CR's project manager, Rocky Morgan, testified that he opposed Corstone's plan to extend the road because the heavy machinery would destroy the sub base and end up costing more than using a small crane to move materials into the area.

Corstone and CR were communicating about potential issues with the on-site soil. CR gave Corstone two options, one was to export the wet and unsuitable soil and import good material, or two, wait until summer to let the soil dry. CR submitted proposed change order 16 to Corstone with cost estimates for option one. In December, CR asked for approval to begin the import/export work on change order 16. Corstone told CR to proceed.

In January 2019, Sherlock sent a letter to Corstone providing written notice of its concerns that Corstone was failing to supply sufficient resources to keep the project on schedule. This was not the first time Sherlock had notified Corstone that it was concerned with the pace of the work.

In February 2019, Corstone submitted change order 27 to Sherlock for CR's work. This change order stated, "Import/Export ongoing, this is not final Total or complete" and had a total of $138,578.18. When Sherlock received this change order, Beal responded, "? Please explain."

Corstone revised change order 27 on March 6, 2019, to include and specify CR's change orders 11, 16, and 16b, for the export and import of materials but also stated the work was ongoing and this was not a final total. The total cost increased to

$227,533.92. The change order also included a "General Condition fee for add days due to scope change" of $8,876.76.

On March 7, 2019, Beal rejected this change order in its entirety, explaining, "I had not been notified or warned of any problems accountable for such a large change order." The work conducted by CR was subsequently divided into change orders 27, 33, and 34, and appeared on pay application 11.[3]

Corstone, citing several provisions in its subcontract with CR, did not pay CR for this work. In May 2019, CR sent a notice to its lender that it had not been paid for work done on the project.

Corstone's payment applications 1-18 were paid in full by Sherlock. There was a dispute over pay application 19 and Corstone revised it. Sherlock paid $354,819.86 for the original pay application 19 on January 24, 2020. Beal denied pay application 20 because it contained over $200,000 in denied change orders. Sherlock did not pay the remaining balance of revised pay application 19 or pay applications 20 and 21.

The project was completed with a temporary certificate of occupancy issued December 31, 2019, and a final certificate of occupancy issued February 13, 2020. That same day, Corstone submitted change order 92 to Sherlock requesting "general condition costs" for 179 delay days caused by the owner, citing section 3.10.4 of the contract. This was a $232,071.51 request. Sherlock denied the change order.

In March 2020, CR recorded a claim of lien. One month later, Corstone also recorded a claim of lien.

---

[3] While there are several versions of change order 33 in the record before this court, change order 34 is not in the record. Change order 34 is described from pay application 11 onwards as "Export/import at ramp" for $29,986.65. In pay application 21, it was reduced to $26,461.42.

In June 2020, CR sued Corstone and Sherlock for breach of contract and lien foreclosure.[4]  Sherlock asserted cross-claims against Corstone for breach of contract. Corstone asserted counterclaims against CR, and cross-claims against Sherlock for breach of contract, foreclosure of lien, unjust enrichment, and quantum meruit.

Sherlock moved for partial summary judgment to dismiss Corstone's claims related to extra costs arising before May 31, 2019.  The trial court denied the motion and the case proceeded to a jury trial.

At the close of Corstone's case, Sherlock moved for judgment as a matter of law under CR 50(a).  The trial court granted Sherlock's CR 50 motion in part, dismissing Corstone's claims for unjust enrichment and quantum meruit, but otherwise denied the motion.  Before the case was submitted to the jury, Sherlock asked the court to reconsider its CR 50 motion which the trial court denied.

The jury returned verdicts in favor of CR and Corstone: finding for CR in its breach of contract claim against Corstone with $364,524.70 in damages, and in favor of Corstone in its breach of contract claim against Sherlock with $1,288,620.24 in damages.

Following the trial, the trial court granted Sherlock an offset of the jury verdict by $194,476.26.  The trial court also granted Corstone attorney fees under RCW 60.04.181 for $412,652.00 and $46,030.32 in costs.

Sherlock appeals.[5]

---

[4] Other defendants to the suit included The Hanover Insurance Company, which issued a statutory contractor's registration bond for Corstone, and Alaska USA Federal Credit Union, Sherlock's construction loan lender.  Another subcontractor was dismissed as a party by stipulation before trial.

[5] Corstone originally filed a cross-appeal, however, Corstone moved to dismiss its cross-appeal and it was dismissed without costs to any party by our court clerk on November 28, 2023.

II

Sherlock argues that the trial court erred by denying its CR 50 motion because the unambiguous contract should have been enforced as a matter of law and Corstone waived any right to an increase in the contract sum by not providing written notice before the work began. We agree.

Under CR 50(a)(1), a court may grant judgment as a matter of law on an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find [for the nonmoving party] . . . with respect to that issue." "We review a trial court's decision on a CR 50 motion as a matter of law and 'apply the same standard as the trial court.'" Mancini v. City of Tacoma, 196 Wn.2d 864, 877, 479 P.3d 656 (2021) (quoting Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007)). A CR 50 motion for judgment as a matter of law "'should be granted only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party.'" Mancini, 196 Wn.2d at 877 (quoting H.B.H. v. State, 192 Wn.2d 154, 162, 429 P.3d 484 (2018)). "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" Mancini, 196 Wn.2d at 877 (quoting Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001)). We may affirm the trial court's decision on any ground supported by the record. Washburn v. City of Federal Way, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013).

We interpret a provision of a contract as a question of law. Renfro v. Kaur, 156 Wn. App. 655, 661, 235 P.3d 800 (2010). If the contract language is clear and unambiguous, we will enforce the contract as written. RSD AAP, LLC v. Alyseka

Ocean, Inc., 190 Wn. App. 305, 316, 358 P.3d 483 (2015).  The primary objective in contract interpretation is to determine the intent of the parties.  Thomas Ctr. Owners Ass'n v. Robert E. Thomas Tr., 20 Wn. App. 2d 690, 699, 501 P.3d 608, review denied, 199 Wn.2d 1014, 508 P.3d 679 (2022).  Washington follows the objective manifestation theory of contract interpretation, under which we try to arrive at the intent of the parties by focusing on the objective manifestations of the agreement rather than on the unexpressed subjective intent of the parties.  Thomas Ctr., 20 Wn. App. 2d at 700.  We interpret contracts in a manner that will not render provisions in the contract meaningless.  GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014).  And we read the contract as a whole, avoiding interpretations that lead to absurd results.  Kelley v. Tonda, 198 Wn. App. 303, 316, 393 P.3d 824 (2017).

Washington law generally requires that contractors follow contractual notice provisions unless a party unequivocally waives those procedures.  Mike M. Johnson, Inc. v. County of Spokane, 150 Wn.2d 375, 386, 78 P.3d 161 (2003).  In Mike M. Johnson, a contractor filed a complaint for additional compensation arising out of the contract.  The county argued that the contractor failed to comply with the contractual protest and claim provisions.  Mike M. Johnson, 150 Wn.2d at 384.  The court held that an owner's having actual notice of a changed condition in the work is not an exception to compliance with mandatory contractual protest and claim provisions.  Mike M. Johnson, 150 Wn.2d at 387-88, 391.

The rule of Mike M. Johnson has been extended beyond claims for payment for disputed work, to include claims for expectancy and consequential damages.  NOVA Contracting, Inc. v. City of Olympia, 191 Wn.2d 854, 857, 426 P.3d 685 (2018).  And our

Supreme Court has reiterated that "absent waiver, failure to comply with contractual procedures bars relief." Am. Safety Cas. Ins. Co. v. City of Olympia, 162 Wn.2d 762, 770, 174 P.3d 54 (2007) (citing Mike M. Johnson, 150 Wn.2d at 391).

In Sime Construction Co., Inc. v. Washington Public Power Supply System, 28 Wn. App. 10, 15, 621 P.2d 1299 (1980), our Supreme Court held that a subcontractor was obligated by its contract to give notice of a claim that changed work would increase the contract price. The court explained, had the subcontractor "given the 15-day notice required under the prime contract which would have outlined the additional cost of doing work out of sequence, [the owner and general contractor] could have balanced the desirability of the design improvement against those costs in determining economic feasibility." Sime Constr., 28 Wn. App. at 16.

Sherlock asserts that the contract required Corstone to provide written notice before executing the work to make a claim for an increase in the contract sum. Notice is addressed in three sections of the contract:

**§15.1.4 CLAIMS FOR ADDITIONAL COST**

If the Contractor wishes to make a Claim for an increase in the Contract Sum, <u>written notice as provided herein shall be given before proceeding to execute the Work</u>. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.4.

(Emphasis added.)

**§15.1.2 NOTICE OF CLAIMS**[6]

Claims by Contractor must be initiated by written notice to the Owner with a copy sent to the Architect. Claims by either party must be initiated within ten (10) days after occurrence of the event giving rise to such Claim, or

---

[6] This language is taken from the February 26, 2018 supplemental conditions to construction contract, which modifies the original contract general conditions A201-2007.

within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.  Contractor shall cooperate with the Owner and Architect to mitigate the alleged or potential damages, delay, or other adverse consequences arising out of the condition giving rise to the Claim.  Claims by Owner shall be made in writing to Owner within a reasonable time.  Contractor shall cooperate with the Owner and Architect to mitigate the alleged or potential damages, delay, or other adverse consequences arising out of the condition giving rise to the Claim.  Claims by Owner shall be made to Contractor within a reasonable amount of time.

Written notice is outlined in a separate section:

**§13.3 WRITTEN NOTICE**

Written notice shall be deemed to have been duly served if delivered in person to the individual, to a member of the firm or entity, or to an officer of the corporation for which it was intended; or if delivered at, or sent by registered or certified mail or by courier service providing proof of delivery to, the last business address known to the party giving notice.

The contract also included another section that emphasized the importance of

notice to Sherlock before work began:

**§3.7.4 Concealed or Unknown Conditions.**  If the Contractor encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature, that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, <u>the Contractor shall promptly provide notice to the Owner and the Architect before conditions are disturbed and before undertaking any additional Work</u>, in no event later than ten (10) days after first observance of the conditions.  <u>Failure to provide prompt notice as required herein shall constitute a waiver</u> by Contractor of any adjustment of the Contract Sum or Contract Time for such condition.

(Emphasis added.)

In the February 26, 2018, supplemental conditions, the original contract

constructive change directives were deleted and the following language was

adopted:

> CCD provisions are deleted. Except in case of emergency, Owner and Contractor shall confer and make reasonable best efforts to mutually agree upon the terms of any change to the Work <u>before the changed work is performed</u>. Except as otherwise agreed, all changes to the Work shall comply with Section 7.2 Change Orders. Nothing herein shall limit Contractor's obligation to give timely notice as stated in these General Conditions. If Contractor has given such timely notice, the Owner shall not retain a third party to perform the changed work in question.

(Emphasis added.)

Section 15.1.4 clearly called for written notice to be given before proceeding to execute the work in order to make a claim for an increase in the contract sum. But that is not what occurred.

CR submitted its change order 11 to Corstone on September 17, 2018, for work extending the construction road. This work was completed in October 2018. Corstone did not send a change order for this work to Sherlock until March 6, 2019.

Similarly, CR submitted its change order 16 to Corstone in December 2018 for import/export work and Corstone told CR to proceed. Corstone did not submit change order 27 to Sherlock until February 2019. Sherlock rejected change order 27 in its entirety.

Corstone's project manager, Sean Barquist, testified that he knew that to make a claim for an increase in the contract sum, written notice was required before executing the work. Barquist also testified that the work outlined on change order 27 had been completed when it was sent to Beal. Corstone's CEO and owner, Mark Tapert, testified that Corstone did not give written notice before CR's work started. Corstone President Jeff Jacka conceded that the contract established the procedure Corstone had to follow if it wanted to increase the contract sum.

Thus, it is undisputed that Corstone submitted its change order to Sherlock only after permitting CR to complete a significant amount of the work. This did not comply with the procedures of section 15.1.4.

Corstone fails to respond directly to Sherlock's argument that a contractor who fails to follow contractual notice provisions is barred from seeking additional compensation. Instead, Corstone asserts that the jury was properly instructed on contractual issues and because Sherlock did not challenge the instructions, they are "the law of the case." Even accepting both points, Corstone does not rebut the argument that it failed to comply with the notice provisions. Absent evidence of compliance, its contract claims fail as a matter of law. See Mike M. Johnson, 150 Wn.2d at 391.

Corstone next argues that the contract did not require Corstone to give Sherlock notice and that the initial geotechnical reports and daily reports gave Sherlock ample written notice of the necessity of dirt work on-site. Corstone also asserts that Sherlock knew of this "extra work" because Beal had "on site meetings to discuss the extra costs" and it was "plainly known to Beal and Sherlock."

The contract is between Sherlock and Corstone with Corstone identified as "the Contractor." And the contract included significant soil work. Notice that specific work is occurring on-site is different from written notice of a claim to increase the contract sum. In addition, Beal's on-site meetings happened in March 2019 after Sherlock received the change order and after a significant portion of the work had been completed. Beal explained, "I see there may be soils happening I'm not aware of."

-12-

In any event, the law is clear: an owner having actual notice of a changed condition in the work is not an exception to compliance with contractual notice provisions. <u>Mike M. Johnson</u>, 150 Wn.2d at 391.

Corstone asserts that as soon as Sherlock stopped work, Corstone invoked section 14.3 of the contract, and that this was notice to Sherlock "that Corstone reserved its rights for additional contract time and compensation caused by Sherlock's suspension of the Project." That section provides:

**§14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE**

**§14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**§14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent

> **.1** that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or
>
> **.2** that an equitable adjustment is made or denied under another provision of the Contract.

There are several problems with Corstone's argument. First, in August 2018, Corstone submitted change order 11 to Sherlock for remobilization costs after the work suspension and Sherlock paid for those costs. Other than the remobilization costs, at that time, none of the subcontractors conveyed to Corstone an escalation of costs because of the suspension.

Second, and more importantly, we read the contract as a whole. <u>Kelley</u>, 198 Wn. App. at 316. Section 14.3 must be read with section 15.1.4. Corstone could have made

a claim for additional cost under section 15.1.4 when CR submitted change order requests in fall 2018 and argued under section 14.3 that the additional cost was because of the suspension pushing the work into the wet rainy months. But Corstone did not do this.

Sherlock was not provided with notice that the cost of excavation work would escalate before the work commenced. While it might be obvious that those costs would increase in the rainy winter months compared to the dry summer months, the contract by its plain language required written notice before proceeding to execute the work. Notice would have given Sherlock the option to pause the work until the soil had dried, as CR's project manager suggested, or to approve the additional costs. Notice was only provided to Sherlock in February 2019 by change order 27 after a significant portion of the work was completed. This did not comply with section 15.1.4.[7]

We conclude that because strict compliance with notice and claim provisions is required, the evidence could not support a verdict for Corstone on this claim and it was error for the trial court to deny Sherlock's CR 50 motion.[8]

III

Sherlock argues that there was not substantial evidence supporting the jury's verdict for "delay day damages." We agree.

---

[7] In response to Sherlock's CR 50 motion, Corstone also argued that its claims arose out of "earthwork" that is excluded from the contractual notice provisions under exclusions to the contract for the import and export of unsuitable soils and over excavation. Even if Corstone is correct that the work was excluded from the contract, then both Article 7, change orders, and Article 15, notice of claims, of the contract would apply and Corstone would have been required to provide written notice before the work commenced.

[8] Because we agree with Sherlock that the trial court erred by denying its CR 50 motion, we do not reach Sherlock's alternate argument that Corstone waived and released claims and liens related to work that occurred before May 31, 2019.

"For a general verdict, '[t]he determinative issue is whether there was evidence or reasonable inferences arising therefrom to sustain a verdict in plaintiff's favor.'" Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 131, 875 P.2d 621 (1994) (quoting Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 261, 840 P.2d 860 (1992)).

Corstone submitted change order 92 on February 13, 2020, following completion of the project. Corstone requested an increase in the contract sum of $232,071.51 for additional general conditions arising from 179 delay days.[9] This amount was almost equal to the amount for general conditions in Corstone's bid.

The contract included the following provision for general condition rates.

§ 3.10.4 The addition or modification of the Work that involves any increase in the Cost of the Work shall also include reasonable General Condition costs and time extensions accordingly. <u>General Condition rates of $1,108 / Calendar Day shall be added to the Change Order</u>. Contractor shall be entitled to an increase in the Contract Sum for any additional general conditions and subcontractor costs incurred <u>that result solely from delays to the project schedule caused by Owner</u>, Architect, Architect's consultants, Landlord and Owner's separate contractors. As for delays resulting from any other causes, except for those caused by Contractor or its subcontractors, <u>Contractor shall be entitled solely to additional time in the project schedule, provided that such delays result in impact to the critical path</u>.

(Emphasis added.) Thus, Corstone was only entitled to general condition rates solely from delays to the project schedule caused by Sherlock, and those rates "shall" be added to the change order. The use of "shall" is generally understood to be mandatory. Agnew v. Lacey Co-Ply, 33 Wn. App. 283, 288-89, 654 P.2d 712 (1982) (holding that the phrase "shall be entitled" has been given mandatory meaning and aggregating

---

[9] General conditions are things like project supervision, temporary facilities, and clean up. Jacka testified that general conditions are "the cost that keeps the job churning along. It's everything from the job shack to the water cooler to the superintendent on site to the temporary toilet to power."

cases considering attorney fees clauses in contracts, constitutional or statutory language, and contracts).

Alternatively, Corstone would be entitled "solely to additional time" in the contract schedule for delays, except those caused by the contractor or subcontractor, resulting in impact to the critical path.

Corstone's only arguments on this issue are that the change orders summarized in change order 92 were approved by Beal and that Sherlock's suspension of work, a delay solely caused by Sherlock, pushed the dirt work into the wet winter months.

At trial, the burden was on Corstone to prove the general condition rates requested in change order 92 were from delays solely caused by Sherlock. After reviewing the evidence, we find some support for Corstone's claim and some conflicting evidence that does not support Corstone's claim.

Change order 92 was based on alleged delay days outlined in the following change orders: 22, 41, 51, 52, 55, 66, 70, 73, 77, 81, 83, 84, 86, 87, 88, 90, and 91.

First, the general condition rates in change order 92 are for work done between April 22, 2019 and January 31, 2020. It is not for the "dirt work" that CR completed. And Barquist, who created the change orders, testified that change order 92 did not include any delays for the work stoppage at the front end of the project.

Change order 22 did include a general condition fee for $739.73. But it did not include additional days that would be added to the contract time. Barquist testified that change order 22 "relates to revised drawings provided by owner." Even so, change order 22 was included starting in pay application 11 and paid in full before the disputed pay applications. Thus, there was no support in the record for adding an additional

-16-

delay day from change order 22 or additional general condition rates for that day in change order 92.

Barquist testified at trial that change order 70 was "initiated by David Beal." Change order 70 was signed by Beal and while it did not include an amount for general condition fees for additional days, it did state that the contract time would be adjusted by 14 days.

Change orders 87, 83, and 90, involved requests by the City. Barquist testified that for change order 83, Sherlock "hired the soldier pile portion of the work directly. We were required to for the staking for the City of Duvall, and the owners subcontracted. This is the process that took for the redesign and approval by the City of Duvall." For change order 90, Barquist testified that the City did not want the green power box to be visible from the road and Corstone "t[ook] direction" from Beal's design team.

Barquist testified that change order 73 impacted the critical path. But he did not testify that the delay, totaling 50 days, was solely caused by Sherlock. And under the contract, "delays resulting from any other causes" only permit Corstone to "additional time in the project schedule, provided that such delays result in impact to the critical path."

For change orders 51 and 52, general condition rates were included in the amount requested on the change order. But the lines were crossed out and, presumably, not approved by Beal. Barquist only testified about the number of additional days these change orders required and that Beal signed the change orders.

For the remaining change orders, Barquist did not testify about who caused the delay. Instead, Barquist testified about the number of additional days added to the

contract time and whether the change order was signed by Beal. Change orders 55 and 77 are not in the record before this court.

And—excluding change order 22 and change orders 51 and 52 where the amounts were crossed out—none of the other change orders included the total amount of general condition rates in the amount for the change order. As for a separate change order that requested an extension of the contract time, Barquist testified that it was not included in change order 92 because "[t]here's no dollar value associated with it." That change order also did not include the amount of general condition rates.

We conclude that many of Corstone's arguments for delay day general condition rates specifically caused by Sherlock were unsupported by substantial evidence. Thus, we vacate the verdict on the issue of change order 92 and remand for additional fact-finding on this portion of the claim.

IV

Sherlock argues that should the judgment stand in any fashion, we should find that the trial court erred by refusing to offset $130,000 in damages Sherlock paid directly to a subcontractor. We agree.

"It is a basic principle of damages, both tort and contract, that there shall be no double recovery for the same injury." Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 702, 9 P.3d 898 (2000). When a party seeks an offset against a judgment, they must show that they paid in the manner alleged, and that they have a right to have the payment credited against the obligation embodied in the judgment. Maziarski v. Bair, 83 Wn. App. 835, 841, 924 P.2d 409 (1996). This court reviews a trial court's decision on offsets for abuse of discretion. Eagle Point, 102 Wn. App. at 701. A

court abuses its discretion if its decision is not based on tenable grounds or tenable reasons.  Layne v. Hyde, 54 Wn. App. 125, 135, 773 P.2d 83 (1989).

In its trial brief, Corstone asserted that it would "request that the Jury return a verdict in its favor for the unpaid contract balance of $1,288,620.24, subject to adjustment by the Court for, if the evidence is not excluded, payments made by Sherlock to some of Corstone's subcontractors."  The jury awarded Corstone its requested damages of $1,288,620.24.

Following trial, Sherlock opposed Corstone's motion for entry of judgment and argued that they were entitled to offset the judgment by $331,129.61 because of Sherlock's payments to settle additional subcontractor claims before trial.  The trial court ordered an offset amount of $194,476.26.  It did not include "the $130,000 alleged to have been paid to Forge as the Court finds the documentation submitted in support of the request to be insufficient to support an offset."[10]

The evidence before the trial court about Forge included Sherlock's purchase of a $130,000 cashier's check on February 16, 2021; a sworn, recorded release of Forge's lien; and a stipulated dismissal signed by Corstone, Sherlock, and CR dismissing Forge as a party to the case.  In addition, Aaron Beal, Sherlock's managing partner, testified at trial that Sherlock had paid a total of $331,129.61 to subcontractors including Forge.

This evidence should have been sufficient to include this amount in the trial court's offset order.  We conclude the trial court abused its discretion by not offsetting

---

[10] Sherlock's brief only discusses the amount paid to Forge.  The trial court also denied an offset for the amount paid to MOCON Fence Contractors.  The amount Sherlock purportedly paid to MOCON was $6,653.35.

the judgment by this amount and, on remand, this amount should be subtracted from the judgment.

V

The trial court awarded Corstone attorney fees under RCW 60.04.181(3). RCW 60.04.181(3) permits the trial court to allow the prevailing party in the action to recover costs and fees. Because we reverse a portion of the judgment, and remand for further proceedings on a second portion of the judgment, on remand the trial court should reconsider whether either party is entitled to attorney fees and costs as the prevailing party under this statute.[11]

Both parties also request fees on appeal. Sherlock asserts that it is entitled to fees on appeal under both a mutuality of remedy theory and RAP 18.1. Corstone requests fees on appeal under RCW 60.04.181(3) and RAP 18.1. We decline to award fees to either party.

We reverse the trial court's order denying Sherlock's CR 50 motion, order on judgment and offset, and order awarding Corstone attorney fees. We remand for further fact finding on whether Corstone had a right to delay day damages, and for further consideration of attorney fees.

---

[11] Sherlock also argued the trial court erred by imposing the statutory interest rate for postjudgment interest instead of the percent revealed by the contract which states, "[p]ayments due and unpaid under the Contract Document shall bear interest at the rate of six (6%) simple interest per annum." Because we remand for additional findings from the trial court, we leave the issue of interest to the trial court.

_Mann, J._

WE CONCUR:

_Feldman, J._

_Hazelrigg, A.C.J._